### TREADWAY v. SCHNAUBER, ET AL.

*1. MUNICIPAL CORPORATIONS:* POWERS: DOUBT CONSTRUED.   A municipal corporation possesses, and can exercise, the following powers and none others:

1.   Those granted in express words.
2.   Those necessarily implied, or necessarily incident to, the powers expressly granted.
3.   Those absolutely essential to the declared objects and purposes of the corporation—not simply convenient, but indispensable.

And any fair doubt as to the existence of a power is resolved, by the court, against the corporation and the existence of the power.

*2.* ———*:* AGENTS AND OFFICERS: POWERS AND DUTIES.   Agents and officers of a municipal corporation cannot bind the corporation by any act which tran-

Treadway vs, Schnauber et. al.

scends their lawful or legitimate powers. And this rule applies to the issue of negotiable, as well as unnegotiable, evidences of debt.

3. ——: ——: ——. The duties and powers of the officers of a municipal corporation are prescribed by statute, and every person dealing with them as such, may know, and is charged with the knowledge of, the nature of their duties and extent of their powers.

4. ——: ——: ——. There is a broad distinction to be observed between *an irregular exercise of granted power*, and *the total absence or want of power*.

5. *COUNTY:* CHARACTER: PURPOSES. A county is strictly a political corporation—a granted power to a designated portion of the people, to aid and arrange the machinery of government of the whole state or territory. It is not designed for pecuniary profit, nor has it any powers but such as pertain to its strict municipal and public character.

6. *TERRITORIAL LEGISLATURE:* SOURCE OF POWER. The territorial legislature is a creature of Congress; its powers, duties and sessions are defined and limited by the act organizing the territory, and the amendments thereto, and it derives no life or power from any other source.

7. ——: ——: EXTRA SESSION. The territorial legislature is authorized to hold a biennial session of not to exceed forty days, and there is no provision empowering any one to call, or the members to meet in extra session, or to extend the session beyond the time specified.

8. ——: ——: ——: ACTS NULL AND VOID. The biennial session of the territorial legislature had convened, remained in session during the limit of forty days and adjourned. The members subsequently convened in a so-called extra session, and passed an act authorizing counties and townships to vote aid to railroad companies. *Held:*—that the so-called extra session was unauthorized and illegal, and all its acts and proceedings null and void.

9. *MUNICIPAL BONDS:* COMMISSIONERS: RATIFICATION. The county possessing no power to vote aid to a railroad company, commissioners could not bind the county by issuing what purports to be its bonds; and the county having no authority, originally, to authorize their issuance, it could not ratify the act after it was done. Such bonds are therefore void, even in the hands of an innocent holder, and the collection of tax levied to pay the interest thereon should be perpetually enjoined.

## *Appeal from Yankton County District Court.*

IT appears from the record that the members of the territorial legislature convened in regular session in the month of December, 1870, and remained in session for full forty days, the limit of time allowed by law. And that subsequently, pursuant to a request therefor, made and issued by the then acting Governor of the Territory, the former members of said legislative body convened in a so-called extra session, and

passed an act entitled "An act to enable organized counties and townships to vote aid to any railroad and to provide for the payment of the same " Afterwards, to wit: on the second day of September, 1871, in accordance with the terms of said act, at an election called by the county commissioners, the voters of Yankton county voted to extend the aid of said county to the Dakota Southern Railroad Company, by a donation or gift to the amount of two hundred thousand dollars in the bonds of said county, payable in twenty years, bearing interest at eight per cent. per annum, payable semiannually. That on the 27th day of May, 1872, the following act passed by Congress was approved, to wit:

An act in relation to the Dakota Southern Railroad Company.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the act passed by the Legislative Assembly of the Territory of Dakota, and approved by the Governor on the twenty-first day of April, eighteen hundred and seventy-one, entitled "an act to enable organized counties and townships to vote aid to any railroad, and to provide for the payment of the same," be and the same is hereby disapproved and annulled, except in so far as is herein otherwise provided. But the passage of this act shall not invalidate or impair the organization of the company heretofore organized for the construction of the Dakota Southern railroad, leading from Sioux City, Iowa, by way of Yankton, the capital of said territory, to the west line of Bon Homme county, or any vote that has been or may be given by the counties of Union, Clay, Yankton and Bon Homme, or any township granting aid to said railroad, or any subscription thereto, or anything authorized by and that may have been done in pursuance of the provisions of the aforesaid act of the Legislative Assembly of said Territory toward the construction and completion of said railroad; and the said Dakota Southern Railroad Company, as organized under and in conformity to the acts of the Legislative Assembly of said Territory, is hereby recognized and

declared to be a legal and valid corporation; and the provisions of the act of the said Legislative Assembly first aforesaid, so far as the same authorize, and for the purpose of validating any vote of aid and subscriptions to said company for the construction, completion and equipment of the main stem of said railroad, between the termini aforesaid, are hereby declared to be and remain in full force, but no further, and for no other purpose whatsoever.

SEC. 2. That for the purpose of enabling the said Dakota Southern Railroad Company to construct its said road through the public lands between the termini aforesaid, the right of way through the said public lands is hereby granted to said company to the extent of one hundred feet in width on each side of said road: *Provided*, That nothing in this act shall relieve said Dakota Southern Railroad Company from constructing and completing said railroad in accordance with the . conditions and stipulations under which the citizens of the counties therein named, voted aid to said railroad in accordance with the laws of said territory, approved April twenty-first, eighteen hundred and seventy-one: *Provided further*, That said Dakota Southern Railroad Company shall issue to the respective counties and townships, voting aid to said railroad, paid up certificates of stock in the same in amounts equal to the sums voted by the respective counties and townships."

During the years 1872 and 1873, the board of county commissioners of Yankton county, acting in behalf of said county, executed, issued and delivered to said railroad company the bonds of said county to the amount of two hundred thousand dollars, bearing interest at the rate of eight per cent. per annum, payable semi-annually, interest represented by coupons attached to the bonds. For the purpose of paying the interest on said bonds, a tax was levied on all the taxable property in said county. Plaintiff brings this action for the purpose of having said railroad tax so levied declared illegal and void, and for an injunction perpetually enjoining the collection thereof.

To plaintiff's complaint defendants filed a general demurrer, which demurrer was sustained by the court below, and plaintiff appeals.

*Moody & Cramer*, for appellant.

The question for our consideration is: Was there any existing valid law enacted by any competent tribunal which authorized these proceedings, upon which, the levying of this tax was based? If there was not some express authority to incur this debt, and to pay it by taxation, it will not be claimed that the tax was legal or binding, for no one can pretend that the powers here exercised are among the implied powers of a board of county commissioners.

The only law of the Territory upon the subject, is that of the 21st of April, 1871, set forth in the complaint. First, then, what was the effect of the enactment by the Territorial Legislature of the 21st of April, 1871, standing alone, unsupported by the law of Congress? Had it any validity? We need not urge that the powers of the Territorial Legislature are *delegated powers*, *only*, derived from some law of Congress. If Congress has not authorized the *session*, one cannot be held. If the *subject* of legislation is not within the scope of those " rightful subjects " delegated to the Territorial Legislature, such legislation is without authority.

Section 4 of the Organic Act contains the following proviso: " *Provided*, That no one session (of the Legislative Assembly) shall exceed the term of forty days, except the first, which which may be extended to sixty days, but no longer." (U. S. Statutes at Large, Vol. 12, page 239.) By act of Congress, approved March 3d, 1869, U. S. Statutes at Large, Vol. 15, page 300, it is provided " that hereafter the members of both " branches of the Legislative Assemblies of the several Territories shall be chosen for the term of two years, and the " sessions of the Legislative Assemblies shall be biennial. " And each Territorial Legislature, shall, at its first session " after the passage of this act, make provision by law for " carrying this act into effect."

The Legislature had been in session full *forty* days in December and January, 1870–71, and could not hold a session again, within two years. Its powers were for that length of time exhausted. The called session, therefore, held on the 21st of April, 1871, was wholly without authority, and its enactments a nullity. At the time, then, of the voting on the 2d of September, 1871, and of the doing of any of the acts that were done, up to the 27th of May, 1872—the time of the passage of the law of Congress—there was no law in existence authorizing the vote, or the doing of any act, toward giving to the railroad company the property of the county, or incurring any indebtedness to aid them, or the raising of any tax, for such a purpose. And so far as this plaintiff is concerned, all was as though nothing had been done or attempted.

We come now to the question: What effect had the law of Congress upon this Legislative enactment, and how far did it extend toward making those acts legal, which before, were without authority of law? (Found in U. S. Statutes at Large, Vol. 17, page 162.) The main object of this law of Congress seems to have been to make of the Dakota Southern Railroad Company a legal and valid corporation—which it was not before—and it will be observed that an impression seemed to prevail, that the act of the Territorial Legislature of April 21, 1871, was the charter of the railroad company, and contained in such charter was the authority to vote aid and subscription to it, by the counties and townships, while upon an examination of such Legislative enactment, it will be seen that it had no reference whatever to such railroad company. The annulling the Legislative enactment, therefore, did not effect the organization of the company in any way, or any subscription to its capital stock.

Congress did not seem to have its attention called to the real facts in the case, as appears not only from the act itself, but from the debates in the Senate upon the bill. (See Congressional Globe, parts 4 and 5, 2d session 42d Congress, pages 2836, 3356, 3762.) The disapproving and annulling of what was already a nullity, neither helped or harmed; and we submit that all that portion of the act which provided that the

passage of that act shall not invalidate and impair, etc., amounts to nothing. We have only to do with the affirmative legislation therein, which, so far as it affects this case, is con tained in these words: " And the said Dakota Southern Rail- " road Company as organized under and in conformity to the " acts of the Legislative Assembly of said Territory, is hereby " recognized and declared to be a legal and valid corporation; " and the provisions of the act of said Legislative Assembly " first aforesaid, so far as the same authorize, and for the pur- " pose of validating any vote of *aid and subscriptions* to said " company for the construction, completion and equipment " of the main stem of said railroad, *between the termini afore-* " *said*, are hereby declared to be and remain in full force, *but* " *no further, and for no other purpose whatsoever.*" And also in the concluding proviso of said act, relating to the issuing of *paid up* certificates of stock to the municipalities voting aid. We submit, that the proper rule of construction of this act is one of strictness, in favor of the party whose property is taken from him by taxation, against his will, and given to this corporation.

It will be observed, there is no attempt at validating the vote that had been had, directly, but the act, (which was a nullity) for the purpose of validating a *vote* of *aid and sub- scription* to said company, and for that purpose only, was declared to be and remain in full force, and care was taken that it should have no other effect. This was equivalent to saying, that so far as the people had gone, in voting to aid this company, by agreeing to subscribe to its capital stock, and to validate that act alone, they would declare the act of the Legislature of Dakota to be in force, and leave whatever was necessary to carry that agreement into operation, to future legislation.

Now no vote to aid the company *by subscription to its cap- ital stock* had been had. The vote was for a *gift*, or *donation*. There might be a vast difference in the liability of the county, whether it was a gift of so much, and that the end of it—or whether the liability of a stockholder was incurred; for the Incorporation act, under which this company was organized,

makes the county, in a certain contingency—and that beyond its control—liable for all the debts of the corporation, though its stock was paid in full. (Laws of 1867-8, page 198, § 136.) Therefore the vote, which was actually had, was in no way validated.

Again, supposing the vote had been validated, all the other provisions of the law—those relating to the issue and delivery of the bonds, the payment of interest, the manner of raising, and the authority to raise, the tax, etc., etc.—were not in force, and without some subsequent legislation, the power to carry that vote into effect was wanting. The right to assess more than four mills county tax, and three mills sinking fund, nowhere exists, and that is covered by the other tax levied, exclusive of this railroad tax.

We need not argue, that in the absence of express power to levy a greater tax, and in the face of the prohibitory laws upon that subject, even if the debt was rightfully incurred, the tax to pay it could not be assessed, at least, without the aid of the court.

It will be further observed that this act of Congress refers to a vote of aid and subscription, to a company having its western terminus at the west line of Bon Homme county, while the vote was to favor a road having its western terminus at the city of Yankton, in this county. We venture no vote could have been obtained for a road terminating at the west line of Bon Homme county; and this act, if it amounted to anything, changes the whole contract between those so voting, and the company, and without their consent. But, if the act of Congress is construed as validating the entire act of the Territorial Legislature of April 21, 1871, had Congress the power to impose this burden upon the people of a county for the benefit of a railroad company, with its road and franchises not only extending beyond the limits of the county, but beyond the limits of the Territory? Is this among the powers delegated to the Congress of the United States? These are different questions from those presented where the Legislature of a sovereign state seeks to enact such laws for its own citizens. The question there usually is, has such legislation

been *inhibited* by the fundamental law? Here the question is, have such powers been *delegated* to Congress? Are they among the *enumerated* powers of the government? (Cooley's Const. Lim., pages 9, 173, and cases there cited; Church J.— Opinion in *People v. Flagg*, 46 N. Y., 405.) We know of no case which has ever arisen in the courts that meets this question fully, and can be cited as a precedent. This seems to be a case of first impression so far as the particular question involved is concerned. This case differs, also, from nearly all the cases decided in the State courts, in that this was a donation, a gift, and not a subscription to the capital stock— a mere exchange of property—or an investment of the public funds in a particular direction.

We are not embarrassed here by the decisions of the courts of the States. They may serve to illustrate the question, but can hardly form, properly, precedents. And as illustrations of what should be the holding of the court, where it is, as now, a question of principle, we submit the better reasoning is found in the following cases and commentaries: (Cooley's Const. Lim., 212–215, and notes; *The People v. Salem*, 20 Mich., 452, (4 Am. 400); *Stokes v. Scott Co.*, 10 Iowa, 166; *State v. Wappello Co.*, 13 Iowa, 388; *Meyers v. Johnson Co.*, 14 Iowa, 47; *Smith v. Henry Co.*, 15 Iowa, 385; *Ten Eyck v. Keokuk*, 15 Iowa, 486; *Clark v. Des Moines*, 19 Iowa, 212; *McClure v. Owen*, 26 Iowa, 243; *Hanson v. Vernon*, 27 Iowa, 28; *People v. Township Board of Salem*, 21 Mich., 11; *Bay City v. State Treas.*, 23 Mich., 499; *Whiting v. Sheboygan R. R.*, 25 Wis., 167; *Phillips v. Albany*, 28 Wis., 357; *Lewis v. Commissioners*, 12 Kansas, 186; *Sweet v. Hulburt*, 51 Barb., 316; *Loan Coms. v. Topeka*, 20 Wall., 655.) And dissenting opinions in many of the cases, where a majority of the Court sustained the validity of the act.

Under what power, conferred by the Constitution, can Congress take the private property of A, and give it to B, whether under the guise of taxation, or otherwise? Congress donates the public lands to railroad corporations. It can dispose of them in its discretion, and does give them, not only to railroad companies, but to private individuals, homesteaders and

others. But could this plaintiff's property be taken, and given, or disposed of in any way to a homesteader? Congress donates the public moneys! Yes, but they are moneys belonging to the *public*, raised from imposts, or taxation upon the whole people of the United States alike.

Congress may legislate for the territories acquired by conquest or cession, from necessity, "but with powers not ex-" ceeding those which Congress itself, by the Constitution, is " authorized to exercise over citizens of the United States, in " respect to their rights of persons or rights of property." (*Dred Scott v. Sanford*, 19 How., 395, etc.; *Am. Ins. Co. v. Canter*, 1 Pet., 542-3; *U. S. v. Gratiot*, 14 Pet., 537; *Cross v. Harrison*, 16 How., 194.) If Congress possesses the power to pass such an act as this is claimed to be, what is to hinder its authorizing and requiring all the property of all the people of the county to be taken, in the form of taxation, and given to the Northwestern, or Illinois Central railroad, terminating at Sioux City, Iowa, because of some supposed benefit those roads are to the Territory.

The pretense of a vote does not strengthen the authority to impose this tax. If it can be done *with*, no one will deny, it could be done *without*, a vote. If it requires the expression of the will of a majority of the legal voters of the county to make it valid, then the sovereign power of Congress is at an end. And, if so, in this case, when this retroactive law was passed, where is the evidence that a majority of the then residents and property owners consented? If this power exists in Congress, it is simply despotic, nothing less.

In a State the people of one county form a part of that State. They have equally with other citizens a voice in the adoption of the Constitution, by which the legislative power is agreed to be limited, and in the enactment of any law by which they are to be governed. If their property is to be taxed it is because they, in common with the rest of the people of the State, have decreed that it should be. They have had the power and the right to be heard as to its expediency and justness. How is it with the people of a county in a Territory? They have no share in the authority to legislate for

them; no voice in the making of their Organic law; no power to say whether they shall or shall not be taxed, if this authority thus to legislate is conferred upon Congress.

This is making " needful rules and regulations " with a vengeance.    Is it not "taxation without representation?"    Can this come within the scope of *needful* rules and regulations? or, is it among the *necessary measures of legislation* for the government of a Territory, temporarily, while it is preparing to take the place to which of right it is entitled, when having sufficient population, and having adopted a Constitution, republican in form, allowing the widest discretion as to what is needful and temporarily necessary?

But I will pursue the discussion of this question no further. I confess my entire inability to do any justice to the subject, and also the embarrassment surrounding it, in view of such an overwhelming mass of legislation, of this character, in the different states, and the seeming support of such *State* legislation by the Supreme Court of the United States; although I know of no case where the courts have gone beyond holding it within the power of the State legislature under their Constitution.

One more suggestion in regard to the extent to which Congress has gone in this law, if it possessed the power thus to legislate.    The rule, that " every statute derogatory to the " rights of property, or that takes away the estate of a citi- " zen, is to be strictly construed," is an axiom in the law.

This retroactive enactment, seeking to make that valid which was before a nullity, authorizing this plaintiff's property to be taken by the strong arm of the law, against his will, and given to another without other pretended compensation than a fancied benefit it possibly might be, to him or his property, certainly is entitled to no more liberal construction.

Now, giving it a fair interpretation, no law exists which provides for the *issue* of the bonds—when they shall issue— by whom they shall be executed and delivered—what rate of interest they shall bear—when or where they shall be payable —what rate of tax shall be assessed—by whom collected and

paid over—the receipt of coupons for taxes—the regulations for the protection of the county. In short, the whole machinery is wanting to carry out the vote validated. And, therefore, it is manifest that Congress only intended to do precisely what they did do, validate a supposed contract between the county and the railroad company, by which the county had subscribed for a certain amount of the stock of the company, and had issued its bonds in payment therefor, whereas the county had done no such thing—had not subscribed for stock nor issued its bonds; but what was done was done by the county commissioners afterwards, without authority of law, and, therefore, their action was *ultra vires* and void.

We have cited no authorities upon the question of the right of this plaintiff to prevent this cloud being put upon his title, because, where, as in this Territory, both the certificate and tax deed are made *prima facia* evidence of the legality of the tax and the proceedings of the officer, the authorities are uniform, and will not be disputed.

*J. R. Gamble*, District Attorney, for appellees.*

Bennett, J.—The complainant in this action asks that the defendants, the treasurer of Yankton county and the county of Yankton and its agents, may be perpetually enjoined from collecting a certain tax levied to pay the interest on certain bonds, alleged to have been issued by the commissioners of said county to the Dakota Southern Railroad Company. To the complaint, defendants interpose a general demurrer, which was sustained by the court below, and plaintiff appeals. The questions presented by this appeal involve the validity and legality of the bonds, and the liability of the county of Yankton thereon.

I desire to state without enlarging on them, a few elementary principles, which I regard as underlying the ultimate questions to be determined. A municipal corporation is de-

*(The reporter is unable to find among the papers any brief of counsel for appellees.)

fined to be a public corporation, created by government for political purposes, and having subordinate and local powers of legislation: *e. g.*, a county, town, city, etc. (Bouvier's Law Dic.)

A municipal corporation possesses, and can exercise, the following powers, and none others: First, those granted in express words; second, those necessarily implied, or necessarily incident to the powers expressly granted; third, those absolutely essential to the declared objects and purposes of the corporation—not simply convenient, but indispensable; and any fair doubt as to the existence of a power, is resolved, by the courts, against the corporation and the existence of the power. (*Vincent v. Nantucket*, 12 Cush., 103; *Clark, Dodge & Co. v. Davenport*, 14 Iowa, 494; *Clark v. Des Moines*, 19 Iowa, 199; *Mintum, v. Larne*, 23 Howard (U. S.) 435; *Bunk v. Chillicothe*, 7 Ohio St., 31; *Sharp v. Spear*, 4 Hill, 76.)

A county is strictly a political corporation—a granted power to a designated portion of the people, to aid and arrange the machinery of government of the whole state or territory. It is not designed for pecuniary profit, nor has it any powers but such as pertain to its strict municipal and public character. (*Jefferson County v. Ford, et. al.*, 4 G. Green, 367.)

Agents and officers of a municipal corporation cannot bind the corporation by any act which transcends their lawful or legitimate powers. And this rule applies to the issue of negotiable as well as unnegotiable evidences of debt. (*Mayor of Albany v. Cunliff*, 2 Coms't, 165; *Hodges v. Buffalo*, 2 Denio, 110; *Boyland v. The Mayor and Aldermen*, 1 Sand'f, 27; *Dill v. Wareman*, 7 Metc, 438; *Vincent v. Nantucket*, supra; *Wood v. Inhabitants of Lyon*, 1 Allen, 108; *Mitchell v. Rockland*, 45 Me., 496; *Western College v. Cleveland*, 12 Ohio, 375; *Commissioners v. Cox*, 6 Ind., 403; *Estep v. Keokuk County*, 18 Iowa, 199; *Clark v. The City of Des Moines*, supra.)

The duties and powers of the officers of a municipal corporation are prescribed by the statute, and every person dealing with them as such, may know, and is charged with the knowledge of the nature of their duties and extent of their powers. (*Delafield v. State of Illinois*, 2 Hill, 159; *Supervisors v. Bates*,

17 N. Y., 242; *Butterfield v. Inhabitants of Melrose*, 6 Allen, 187; *Zabriskie v. Cleveland, etc., Railroad Co.*, 23 Howard, 398; *Clark v. The City of Des Moines*, supra.)

We will save ourselves much confusion and unnecessary perplexity by bearing in mind the broad distinction between *an irregular exercise of granted power*, wherein a corporation acts within the range of its general authority, but fails to comply with some formality or regulation it should not have neglected, but which it has chosen to disregard, *and the total absence or want of power.*

The point on which the decision of this case, in my judgment, must turn, as presented by the record, is not as to any irregularities in the exercise of an unquestioned power, but had the county of Yankton, a municipal corporation under the laws of the territory, power and authority to vote aid to the Dakota Southern Railroad Company, and issue its bonds therefor. If so, when and by what act was it conferred? Its existence cannot be presumed; it cannot be inferred as absolutely essential to the declared objects and purposes of county organization and government, which do not include the building of railroads. We can find it only, if it exists at all, in the so-called act of the Territorial Legislature, approved April 21, 1871, and the act of Congress, entitled "An act in relation to the Dakota Southern Railroad Company," approved May 27, 1872. It is not necessary for me to notice the question as to whether the Territorial Legislature or Congress has the power to authorize a municipal corporation of this Territory to vote aid and issue its bonds to a railroad company, but upon the theory that one or both has the power, has it been done in this case?

The Territorial Legislature is a creature of Congress; its powers, duties and sessions are defined and limited by the act organizing the territory, and the amendments thereto, and it derives no life or power from any other source. It is authorized to hold a biennial session of not to exceed forty days, and there is no provision empowering any one to call, or the members to meet in extra session, or to extend the session beyond the time specified.

This so-called act of the Territorial Legislature was passed at what was termed an extra session of that body, it formerly having convened in regular session, and remained in session during the limit of forty days, when it had adjourned, without day, and ceased to be a legislative body, and the so-called *extra* session was unauthorized and illegal: its acts and proceedings were void, a nullity, and of no more binding force and effect than the resolutions of a town meeting, or the pro ceedings of a territorial convention.    Hence no power whatever was or could be conferred on the county of Yankton by any act that it might undertake or assume to pass.    But the act of Congress of May 27, 1872, is claimed to be a curative or legalizing act.    "Legalizing a legislative enactment," is a phrase that may strike most persons as strange and anomo_lous.    I need not stop to consider whether Congress might not have legalized the call for, and convening of that body in extra session, and thereby have made it a legal legislature, for this it has not attempted to do.    It therefore follows that if it was a self-constituted unauthorized body, possessing no legislative power, no authorized act by competent authority has since changed its character.

It is a general principle, that when an act, proceeding or transaction, is void, and not merely voidable on account of some formal defect, it cannot be cured by legislative action. (Sedgwick on Construction of Statutes, 143, (n.)

As we have seen, the acts of this assumed Territorial Legislature were not merely voidable by reason of some formal defect, but were absolutely void, and I apprehend that Congress does not possess sufficient power, which would have to be something approaching omnipotence, to breathe into them the spirit and life of law.    It would be like breathing vitality into airy nothingness—giving form and being to that which in contemplation of law had no existence.    But it may be insisted that Congress recognized this as a valid act of the Territorial Legislature.    Admit that it did: can Congress by a simple recognition of that as a fact which is a falsehood— as a substance which is even less than a shadow, accomplish that which it could not by positive enactment?    The proposition certainly needs no refutation.

But admitting the fullest power on the part of Congress to legalize the act of this illegal body, and to give to it the force and effect of law, the question arises, has it done it? There is no reference whatever in the act of Congress to any illegality in the supposed act of the Territorial Legislature, and no intimation whatever as to any illegality or want of power on the part of the body that passed it, but on the contrary it is treated throughout simply as an ordinary act of a regular Territorial Legislature. This appears more clearly from the very wording of the statute. The first sentence designates it as " the act passed by the Legislative Assembly of the Territory of Dakota," and again " the provisions of the act of said Legislative Assembly," and the first proviso in the section requires said railroad company to construct and complete its road * * "in accordance with the laws of said territory, approved April 21, 1871." Then what is the clear and obvious purpose and intent of Congress? Primarily to disapprove and annul that act, but providing that so far as the same authorized, and for the purpose of validating any vote of aid and subscription to the Dakota Southern Railroad Company, said act is declared to be and remain in full force, but no further, and for no other purpose whatsoever. What is that but simply annulling an act recognized to be valid, and saving its application to, and operation in, a particular, specified case? The saving clause was made necessary by the annulling provision.

Congress did not propose that this kind of legislation in a Territory should stand, but did not desire to invalidate acts that had already been done under it, or that might thereafter be done with reference to that one particular project. What is there in this law of Congress that can possibly be construed as legalizing the unauthorized acts of that self-constituted body, or giving to that, the force and effect of law, which before was a mere nullity? I am certainly unable to so construe it, without doing violence to its letter and spirit, and to every known principle of construction. It left that so-called act just where it found it; if it was invalid before, it was invalid after.

It has been suggested that admitting the Territorial act to be a nullity and in no sense a law, yet the act of Congress is alone sufficient to sustain the validity of the bonds, having conferred the necessary power on the county and authorized their issue.    I regard this position as entirely untenable. Will any one pretend that that could have been the intent of Congress, as gathered from the wording of the statute?    I think not.    And further its provisions are wholly inadequate for so sweeping a purpose.    It does not undertake to confer any power or authorize the issuance of bonds; it takes for granted that that had been done, but the supposed act which Congress regarded as having accomplished these purposes, having fallen to the ground, all the provisions in the act of Congress relating thereto must go with it.

I, therefore, conclude that at the date of the transactions alleged in the complaint, no power had ever been conferred, either by Congress or the Territorial Legislature, upon counties or other municipal corporations of this Territory to aid in the construction of any railroad or issue its bonds to any company for that purpose; and in the absence of such grant of power, either express or by clear implication, it did not exist.

There being from this view of the case, as presented by the record, a total want of power on the part of Yankton county to extend, in any manner, aid to a railroad company, it follows that the election held in that county on the second day of September, 1871, at which the question of aiding the Dakota Southern Railroad Company was submitted and voted on, was unauthorized, illegal and a nullity, and all subsequent acts done and performed pursuant to that vote were void. The county possessing no power to contract that kind of an indebtedness, it is clear the commissioners could not bind the county by issuing what purported to be its bonds; and the county having no authority, originally, to authorize their issuance, it could not ratify the act after it was done; they are therefore void, even in the hands of innocent holders, and the collection of the tax levied to pay the interest thereon, should be perpetually enjoined.

With the question of good or bad faith on the part of the county, and the hardship to the innocent holders of these bonds, I have nothing to do. Were this a case in which the power in the county was unquestioned, and involved only irregularities in its proper exercise, such considerations could be urged with great propriety, and would be entitled to much weight. But that is not the case. It is certainly well that in this early period of the history of our Territorial jurisprudence, the limit of the power of municipal corporations should be carefully defined and guarded. That those who deal with them should understand that they are charged with the knowledge of the nature and extent of the powers and duties of these corporations and their officers; and that they need not expect to go upon the markets and purchase, blindly, what purports to be their bonds and other evidences of indebtedness, issued without authority of law, and find courts of justice ready to enforce their payment, on the ground simply that they are in the hands of innocent holders, and with the mad-dog cry against repudiation of spurious securities, which in contemplation of law, the corporation never issued.

Municipal corporations are the creatures of the statute; they have no powers except such as are conferred; they can do no act unless authorized. And any act done, which transcends their lawful or legitimate powers, or which they are not authorized to do, is simply not the act of the corporation, and there it ends; and against any legal proceedings instituted thereon, it may interpose the plea of *ultra vires*. The sooner these well settled principles are thoroughly understood and acted on, the better it will be, both for the corporations, and those dealing with them.

I desire to notice briefly one other point, which I deem sufficient in itself to warrant my conclusions in this case. Admitting that the act of Congress rendered valid the Territorial act, and legalized all proceedings had thereunder, did it not do more? The pretended Territorial act provided that aid might be extended to any railroad company, in one of three ways: 1st, by donation; 2d, by loan of credit; 3d, by subscription to capital stock. It is alleged in the complaint

that the voters of Yankton county, voting at the election held
September 2, 1871, voted to extend the aid of the county to
the Dakota Southern Railroad Company, by a donation or
gift to the amount of two hundred thousand dollars, in the
bonds of the county.  Now the last *proviso* in the second sec-
tion of the act of Congress, reads as follows: " That said
Dakota Southern Railroad Company shall issue to the re-
spective counties and townships, voting aid to said railroad,
*paid up certificates of stock* in the same, in amounts equal to
the sums voted by the respective counties and townships."
This provision clearly requires the company to issue paid up
certificates of stock, and as clearly requires the county to re-
ceive and accept them, and by implication prohibits the
extending of aid to railroad companies, by counties and town-
ships, by way of donation or loan of credit.   There is no
pretense that Yankton county has ever voted to subscribe to
the capital stock of said company.   The bonds were issued
after the passage of the act of Congress, and it no where ap-
pears from the record in this case, that the county has ever
assented to the change made in its contract with the company,
or ever ratified the acts of its commissioners.   If the county
can be bound at all it must be in manner provided by the act
of April 21, 1871, and the only method therein pointed out,
is by the voice of the people expressed through the ballot
box; and after it has made its contract, as therein directed, I
know of no earthly power that can change it, against the
will of the county.   It may be said that the change was in
the interest of the county, but that matters not; parties to
contracts must be the judges as to what is their interest and
what not.   The county may think very differently on this
point.   This provision if accepted made the county a stock-
holder in said company, with all the liabilities and responsi-
bilities which attach under the provisions of the statute of
the Territory, under which said company was organized and
incorporated, and these may be of such a character that no
county would desire or wish to assume them.   This Yankton
county virtually refused to do by voting aid by way of a gift
or donation.   There is just one way of escaping the logical

conclusions to which we are driven, and that is by holding that the people of a county are entitled to no voice in determining the nature, character and amount of the pecuniary liabilities with which they are to be burdened. When that point is reached, despotism will have displaced law, and arbitrary power will make and construe its own decrees.

The judgment of the court below, sustaining the demurrer, is reversed, and the cause remanded.

REVERSED.

SEPARATE OPINION OF ASSOCIATE JUSTICE BARNES: I think the judgment sustaining the demurrer in the court below must be reversed and judgment entered for the plaintiff as demanded in the plaintiff's complaint. I am entirely unable to satisfy myself that Congress has the power to authorize an organized county in a Territory to vote aid to a railroad corporation either by loan of its credit, by donation or by subscription to its capital stock, and then authorize the levy of a tax to pay the interest and ultimately the principal of the bonds issued to said railroad company. I am aware that this class of legislation, when exercised by a sovereign State, has been upheld both by the State and Federal courts.

From an examination of the authorities bearing on this question, it will be found that the decisions are based upon the fact that the State being sovereign there is no limit to the power of taxation, except only that the tax must be intended for a public purpose, and except that the taxation must not be so enormous as substantially to amount to confiscation.

The sovereign State possessing this power of taxation, it is held that the question of the issuance of bonds, and the levy of a tax, may properly be submitted to the electors of the town, county or municipality particularly interested in the proposed public improvements. (See *Bridgeport v. Railroad Company*, 15 Con., 475; 21 Penn. St., 148; *Railroad Company v. Clinton County*, 1 Ohio St., 77; *Ryder v. Railroad Company*, 13 Ills., 516; Radfield on Railways, 534; 10 Wis., 195 and 271; *Whiting v. Sheboygan & Fon du Lac Railroad Company*, 25 Wis., 167, and the numerous cases therein cited.)

The taxing power of a sovereign State, except as limited by the State or United States constitution, is limited in extent only by the will of the government itself.  No limitation or restriction upon the exercise of this power can be raised by implication, but the intention to limit or abridge must be expressed in clear and unambiguous language. (Cooley on Taxation, 66; 7 Wall, 71.)

All definitions of taxation imply that it is to be imposed only for public purposes, and whatever difference of opinion may exist regarding the admissibility of taxation in particular cases, the fundamental requirement that the purpose shall be public will be conceded on all sides.

And upon an examination of the authorities above referred to, it will be seen, the unlimited and sovereign power of a State to levy tax for all public purposes, is conceded; but the troublesome question has been to find some substantial reason for holding that railroad corporations, owned by private persons, controlled and managed in the interest of private parties, were public improvements of that kind that authorizes the exercise of the taxing power of the State in taking the private property of individuals to aid in their construction.

I will not comment upon the serpentine process of reasoning by which this extraordinary taxation is upheld.  It is sufficient to say this legislation is sustained by the courts, because not forbidden by State constitutions.

We now examine the Constitution of the United States, not to ascertain whether this class of legislation by Congress is prohibited by that Constitution, but to ascertain whether this power is expressly conferred by the people or the States, upon the general government; or, is this highest and sovereign power of extraordinary taxation plainly implied from any specific grant of power to the general government.  Cooley on Constitutional Limitations, page 173, says: " The government of the United States is one of enumerated powers; the governments of the several States are possessed of all general powers of legislation."  When a law of Congress is assailed as void, we look in the National Constitution to see if the grant of specified power is broad enough to embrace it; but when

Treadway vs. Schnauber, et al.

a State law is attacked on the same ground it is presumably valid in any case, and this presumption is a conclusive one, unless in the Constitution of the United States or of the State we are able to discover that it is prohibited. We look in the Constitution of the United States for grants of legislative power, but in the Constitution of the State to ascertain if any limitations have been imposed upon the complete power with which the legislative department of the State was vested in its creation. Congress can pass no laws but such as the Constitution authorizes, either expressly or by clear implication. While the State legislature has jurisdiction of all subjects on which its legislation is not prohibited.

The law-making power of the State recognizes no restraints, and is bound by none, except such as are imposed by the Constitution. (See 15 N. Y., 333; 27 Barber, 593; 4 Mich., 244; 17 Penn. St., 119; 52 Penn., 477; 17 Cal., 547.)

There must be distinct legislative authority for every tax that is levied. This is a principal that admits of no exception whatever. (Cooley on Taxation, 242; *Morris v. Russell*, 5 Cal., 449; 44 Ills., 85.)

Subdivision 3 of Article 4, of the Constitution of the United States, contains this provision: " The Congress shall have power to dispose of, and make all needful rules and regulations respecting the territory or other property belonging to the United States."

Section 2, Article 2, contains this provision: " The President shall have power by and with the consent of the Senate to make treaties, provided two-thirds of the Senators present concur."

Section 8, Article 1, contains this provision: " That Congress shall have power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense, and general welfare of the United States; but all duties, imposts and excises shall be uniform throughout the United States."

The foregoing is the only express grant of power to Congress, to levy and collect taxes, and I think it will not be claimed that this provision of the Constitution would authorize the levy

of a special tax to aid in the building of a railroad, should the same be voted by the electors in one of the organized counties in an organized Territory.

While there may be a question whether the provision of section 3, of article 4, above referred to applies to territory acquired by treaty, subsequent to the adoption of the Constitution, I do not think it necessary to inquire. That the territories of the United States belong to the people of the United States, is a proposition so plain that no argument in support of it is necessary.

The general government hold these territories of the United States, whether acquired by treaty or otherwise, in trust for the people, whom the general government represent and act for, just so far as the general government is expressly or by clear and unmistakable implication authorized to represent the will and protect the interests of the people. Here, then, is sufficient power to authorize Congress to provide a territorial government for the people of the Territory, with usual and ordinary powers of legislation, not exceeding the powers delegated by the people to Congress. Congress acting in the interest of the people, has the power to prescribe needful rules and regulations for the government and settlement of the territories, and the disposition of the public lands in these territories. These territories are governed and must be governed in the interest and for the benefit of the sovereign people. Acting upon this authority, public lands have been surveyed, sold and conveyed to private persons. The purchasers and owners of these lands are entitled to the same protection, and hold substantially the same relation to the taxing power, that they would if these lands were embraced within the boundaries of a sovereign State. These lands have been sold by the government, representing the people, and the government has no more interest in or control over these conveyed lands than the lands of any individual in a State; and I am entirely unable to discover any theory upon which we can uphold the law of Congress authorizing the electors of Yankton county to vote aid by subscription, or otherwise, to aid in the building of the Southern Dakota railroad, and

authorize the levy of a tax to pay the subscription, unless we are prepared to go to the full extent of holding, that the government of the United States is not a government possessing no powers except such as are delegated or granted by the people or the States, but is in fact a government of unlimited and sovereign power; and because a government of unlimited and sovereign power, may authorize the taking of private property to aid in any and all public enterprises, without limit or restriction, so long as the tax is not so excessive as to amount to confiscation.

It is well to observe here that this law of Congress in no way acts upon, or affects, the public lands in this same county. This is not general legislation for the people of the United States, nor is it legislation with reference to the property or rights of the United States, nor is it general legislation in the interest of the Territory of Dakota. It is a class of legislation that has greatly troubled legislators and courts, properly to name or define. It is legislation authorizing the taking of private property of taxpayers in certain counties, and delivering it over to a corporation to expend in the building of a railroad owned by private parties, exclusively, the use of which the public may enjoy by paying full compensation. This is the exercise of the highest and probably the most dangerous sovereign power, only upheld where there is no limit upon the taxing power, except that the purpose shall be public. It is reversing the order of Congressional legislation as heretofore exercised.

Congress has made frequent grants of public lands, and in various ways aided in the construction of railroads through public lands in the territories, and thus benefiting citizens settling upon these lands; but in this instance Congress is attempting to place this burden upon private parties, and thus enhance the value of public lands in these same counties. By this process, and if this kind of taxation can be sustained, a burden before unheard of can be forced upon the pioneers who happen to be so unfortunate as to have purchased government lands. The evils resulting from this kind of legislation in the States have been so great that I regard it fortunate

that Congress has not the power to repeat it in the territories. It requires very little discernment to see that long before the new States could be admitted into the Union, almost every organized county would be bonded to such an extent, in their efforts to procure the building of railroads, that the payment of their bonds would be an utter impossibility. For the purpose of examining the questions presented in this case, and that only, I will now assume that Congress has the power, and that a Territorial Legislature has the power, to authorize a town or county to vote aid to a railroad company; that being so, was there any authority for the vote of aid in this case? Was there any law authorizing the vote, or authorizing the subscription? It is conceded, upon the argument, that the pretended act of the pretended Legislature, approved April 21, 1871, was absolutely void, and the only force or validity now claimed for it, is the validity given to it by an act of Congress, approved May 27, 1872, about eleven months after the passage of the pretended Territorial act. It is admitted that the only vote taken, to determine the wish of Yankton county, was the vote of September 2d, 1871, some six months before the passage of the law by Congress, attempting to validate the vote of aid to the railroad company. It is conceded likewise that at the time of taking the vote there was no law authorizing it to be done.

Here, then, we have to meet the distinct question: can a legislative body pass a retroactive law, and thus make valid that which before was void, that which before had no legal existence? I think not. If the law of Congress of May 27, 1872, made valid the vote of September 2d, 1871, then Congress could make valid the subscription of Yankton county, without submitting the question to the voters of that county at any time. The board of county commissioners had no authority to make an order for holding the election. They had no authority, nor had any official in the county, to receive a vote or certify the result. There was no authority to administer an oath to a voter challenged; in fact, every act pertaining to the taking of that vote, was without authority and void. And if a proceeding of this kind can be upheld, it will

be going but a little farther to sustain a subscription without law and without even an attempt to ascertain the wishes of the voters on the question.

In the case of *Hasbrouck v. The City of Milwaukee*, the city authorities were authorized to make a contract for the improvement of the harbor of Milwaukee, at a sum not exceeding $50,000, to be paid by the issuance of the bonds of the city for that sum; the bonds not to be issued unless a majority of the electors should vote for the contemplated harbor improvement. The voters of the city declared in favor of the improvement, and the work was put under contract. The contract was first made with one Howley, by him assigned to Barton, and after the decease of Barton, by his representatives, to the plaintiff. By subsequent legislation the voters of the city were authorized to increase the amount to $100,000. The contract was changed from time to time, which added materially to the expense, till at the time of its completion by the plaintiff, the amount claimed by the plaintiff was $70,-000 in excess of the amount that the city was authorized to pay, by the various acts of the Legislature as sanctioned by a vote of the taxpayers. Subsequent to the completion of the contract the Legislature passed a law making the contract valid for the full amount, and authorizing the city to pay such sum as the plaintiff claimed over and above the amount the city was authorized to expend for the improvement of the harbor. The city authorities refused to pay any sum whatever in excess of the amount to which they were limited by the former acts of the legislature; in other words, they refused to recognize the validity of this retroactive law of the legislature. The right of the plaintiff to recover depended upon the validity of this retroactive law. The opinion of the court is by Dickson, Chief Justice. The Court say: "It is claimed by the plaintiff, that if under the two previous statutes the city was only authorized to enter into a contract for the construction of a harbor, the expense of which should not exceed $100,000, and that the municipal authorities were not at the time they attempted to do so, empowered to make an agreement or bind the corporation for the payment of a

greater sum, the defect is cured by the operation of the act of February 23, 1857, and that from and after the passage of this act the agreement for the excess became valid and binding upon the city. In the first place it will be observed and should be borne in mind, that the subject with which we are dealing is not one of public policy merely, but of corporate power, and that the inquiry, where the supposed contract of a public corporation is absolutely void for want of capacity to enter into it, a subsequent legislative ratification or recognition of it, is sufficient, without any evidence, that such ratification was procured at the instance, or with the intent on the part of the city, to give such contract life and vitality, could make it obligatory upon the corporation. I do not understand that the city, by any appropriate action, petitioned or asked for the passage of this act. On the contrary, I infer from this proceeding, that it has refused to be bound by it. Under these circumstances the question is, can the Legislature, by recognizing the existence of a previous void contract, and authorizing its discharge by the city, or in any other way, force the city into a performance of it? It follows, from what I have already said, that in my opinion, it cannot. This is not a defect which can be reached by the retroactive power of the Legislature. It cannot, because, in so doing, the Legislature would interfere with vested or fixed rights. It would, of its own mere motion, create an obligation, where, by law, none before existed. It would impose a liability against the will, and without the consent of the party, to be charged thereby. This the Legislature cannot do. It can only act retrospectively for the purpose of furnishing a remedy for the removing an impediment in the way of the enforcement of some pre-existing legal or equitable right or duty, and not for the purpose of creating such right or duty. And this distinction will be found to prevail in all the cases."

(See 23 Wis., 362): This action is to recover bounty money, alleged to have been voted by the defendant, the town of Liberty, in 1864, for volunteers and drafted men. The complaint also set forth a special act of the Legislature of 1866, legalizing the proceedings of said town taken in 1864, and authorizing the

levy of a tax to pay the bounties then voted, at the rate of $200 for each person drafted. The defendant demurred. The demurrer was overruled and defendant appealed. Dickson, Chief Justice: "The order overruling the demurrer must be reversed for the reason that at the time the town meeting was held and the vote taken, there was no law authorizing the towns of this State to raise money by taxation to pay bounties to drafted men. The statutes then in force only authorized the payment of bounties to volunteers, and the raising of money for the purpose of giving aid to the families of volunteers and drafted men. The raising of money to be paid to drafted men, as bounties, or in consideration of these entering the military service, was not authorized by any act of the Legislature. This being so, it is clear that the voters or inhabitants of the town could levy no tax for the purpose of raising money to be paid to drafted men; and if they could not levy a tax, it is equally clear that they could not make a promise or enter into a contract binding a town to such payment—the vote was simply null and void, and being so there existed no obligation on the part of the town to pay the plaintiff and those whose claims he represented, who were drafted men prior to the passage of the act of March 21, 1866. Does that act help the case of the plaintiff? We shall enter no argument to show that if there was no obligation on the part of the town, before the passage of the act, the Legislature could not, without the concurrence of the inhabitants, or proper authorities of the town, originate one upon which an action at law, as upon a promise, may be maintained against the town. If the act be valid for any purpose, and we do not desire it to be invalid, and if the plaintiff has a remedy under it, it must be by some proceeding, to compel the levy and collection of the tax. By an examination of chapter 142, Local Laws of 1866, it will be seen that it first legalizes the proceedings of the town meeting, for the purpose of paying bounties to volunteers and drafted men—and that law further provides for the levy and collection of a tax to pay drafted men and volunteers in the military service; and, therefore, while the court holds that the Legislature could not validate

the void law, it may well be questioned whether the provision was not broad enough to compel the town authorities, in a proper proceeding, to levy and collect the tax to discharge this moral and equitable liability of the town to the drafted men and volunteers."

In discussing this question of retroactive legislation, a very marked distinction must be kept in mind between that class of legislation which cures defects, and legislation validating void proceedings; whether the purpose to be accomplished is the collection of ordinary revenues for the support of government, or ordinary taxes for municipal purposes, which do not require a vote of the taxpayers, or electors, to authorize the levy of the tax, and retroactive legislation to validate void proceedings, which were unauthorized in the first instance, unless sanctioned by vote of the electors.

I think the decisions are uniform in holding that the payment of ordinary taxes for the support of government, whether State or local municipalities, is one of the most sacred duties devolving upon the taxpayer.    He is protected in every respect by the State, and in return for this protection he has pledged his all for the support of that government which protects him.    And if the law which authorizes the collection of the proper tax or revenue, is void, and is so declared by the courts, a fresh or subsequent law may be passed by the Legislature, retroactive in its terms, validating the invalid proceedings, and thus furnishing the means or process for collecting that tax which the taxpayer was under the most sacred obligation to have paid.    And I think the decisions are just as uniform that a legislative body cannot pass a retroactive law, validating void proceedings against the will of the voters and taxpayers, which alone was authorized to make the act valid in the first instance.

Taxation in the case at bar, is taxation in a special proceeding and that for which a special enabling act was required, and not taxation for purely public purposes over which this unlimited power of legislation prevails.    It is a species of taxation which it has been held the Legislature may authorize, subject to the ratification or consent of the

proper local authorities, or of the people of the particular municipality, but not without such ratification or consent.

In 58 Maine, 597, the Chief Justice says: "It requires the contract or "consensual act" of such local authorities, or of the people, to give it validity and effect."

(See *Mills v. Charlton County Treas.*, 29 Wis., 400): If the Legislature in the first instance has no compulsory power of taxation for the purpose indicated, and can only by proper enabling act, submit the matter to the action of the local officers or the people of the municipality, it would seem to follow that it has no power to cure defects, or to waive, or supply omissions in past proceedings, against the will of the party to be charged. Dixon, Chief Justice, says " the Legislature may, in its discretion, authorize a minor to mortgage his land in a particular manner, and for a particular purpose, but if in the supposed execution of the power, the minor should proceed in a different way, or to mortgage for a different purpose, the instrument would be void. Could the Legislature by retroactive measures obviate the defect and declare that a valid contract, which before was void, against the will of the person whose estate was to be charged? This Court is of the opinion that it could not."

(See *Orton v. U. S. Neunon*, 23 Wis., 102): In this case the action was to recover the possession of a piece of land conveyed by a tax deed to the plaintiff. It appears that the land was not properly described in the tax deed. The Legislature passes a law for the purpose of curing the defect, and making valid the deed. The Court say, "the act has no influence upon the question, for the reason that the Legislature has, under the Constitution, no power to declare a deed valid which by law was void at the time of the passage of the act."

It was suggested upon the argument that the commissioners in issuing the bonds to the railroad company might have sanctioned, approved or assented to, the validating act of Congress. I do not think any act of theirs could have that effect, for the reason that it was not the assent of the commissioners that was necessary to authorize the issuing of the bonds, but the express assent of a majority of the electors

was necessary.   The retroactive law validating an invalid law, before it can become operative and binding, must be accepted and sanctioned by the same party or persons, whose assent was necessary in the first instance.

It will be observed that in the discussion of the questions presented in this case thus far, I have assumed that, notwithstanding general powers of legislation are, by the Organic act, conferred upon the Territorial Legislature, yet Congress still retains the right, and may at will, legislate for the Territory.   Of the soundness of this proposition, however, I have grave doubt.   Congress may make all needful rules and regulations for the government of the Territories, and Congress acting under this authority has given to the Territory of Dakota an Organic act.   And it is aptly and well said by Chief Justice Miller: '' The Organic act of a Territory is its Constitution.   Congress having given to the Territory its charter or Constitution, by the provisions of which general powers of legislation are conferred upon the Territorial Legislature, is not the power of Congress to legislate for the Territory at an end? or may Congress and the Territorial Legislature, each, in its own way and time, legislate for the Territory?   If Congress may still legislate for the Territory as to important matter, then it may as to trivial or unimportant matters.   If it may grant charters to railroad corporations, or authorize municipalities to make donations to railroad companies in the Territory, it may grant city and village charters.   It may provide criminal or civil codes and regulate all commercial transactions.   It is unnecessary, however, to discuss this question, and we do not now undertake to decide it.''

It will be inferred from what I have said that in my opinion a Territorial Legislature cannot authorize a county, by a vote of the taxpayers, to aid in the building of a railroad, and then levy a tax upon the taxable property in the county to raise money to discharge that liability.   This power rests only with the Legislature of a sovereign State, whereby the fundamental law of the State, which springs directly from the will of a sovereign people, is unlimited and unrestricted as to this kind of legislation.   The legislative power in a Territory

is not brought into existence by the authority or will of a sovereign people.  Its life, power and perpetuity are subject to the will of Congress.  When the population in a Territory is sufficient to entitle it to representation in Congress, and to justify the formation and organization of a new State, then the sovereign people act, and in their sovereign capacity take the necessary action for the formation of a State constitution; the people then limit the legislative power or not, as they deem most wise.

In examining a law passed by a Territorial Legislature we are governed by the same rules that apply to the examination of an act of Congress, that is to say, we must ascertain whether the power has been delegated or granted to the Territorial Legislature to enact the law under consideration.  Tested by the rules above indicated I come to the conclusion that neither Congress nor the Territorial Legislature, nor both combined, could authorize or empower the county of Yankton to make the donation or subscription to the capital stock of a railroad corporation.  I will repeat as in substance I have before remarked—the Organic act of a Territory is its Constitution. This Constitution provides for one session of forty days, and no longer, biennially.  A session of the Legislature extending beyond this limit, is not only not authorized but it is in violation an disregard of the fundamental and supreme law of the Territory.

CHIEF JUSTICE SHANNON, DISSENTING:  The complaint alleges the illegality and invalidity of a tax, designated as "the railroad tax," levied to pay the interest on bonds to the amount of two hundred thousand dollars, issued by the commissioners of the county and delivered to the Dakota Southern Railroad Company.

The said bonds were issued and delivered in pursuance of the following: first, of an act of the Territorial Assembly, passed at an extra session, on April 21, 1871, the illegality of which session is asserted; secondly, of an election held in September following, at which a majority of those then voting, voted to extend the aid of the county to the said railroad, by

a donation to the amount aforesaid, in bonds of the county, payable in twenty years, with interest; and, thirdly, of an act of Congress, approved May 27, 1872, entitled "An act in relation to the Dakota Southern Railroad Company," which validated the provisions of the Territorial act, so far as the same authorized any vote of aid and subscription to said railroad.

In his complaint the plaintiff prays that said railroad tax, levied on his property, may be declared illegal and void, and that the county and its agents may be perpetually enjoined from proceeding to collect such tax.

The defendants demurred to the complaint, for that it " does not state facts sufficient to constitute a cause of action."

The court below sustained the demurrer, and gave judgment that the complaint be dismissed.   The plaintiff appealed.

By the Organic law of the Territory, of March 2, 1861, it was declared that the legislative power shall extend to all rightful *subjects* of legislation consistent with the Constitution of the United States and the provisions of that act; but no law shall be passed interfering with the primary disposal of the soil; no tax shall be imposed upon the property of the United States; nor shall the lands or other property of non-residents be taxed higher than the lands or other property of residents; nor shall any law be passed impairing the rights of private property; nor shall any discrimination be made in taxing different kinds of property; but all property subject to taxation shall be in proportion to the value of the property taxed.

This law was formed upon the model of the famous ordinance of Congress of the 13th of July, 1787, which has ever since constituted, in most respects, the model of all our territorial governments.

On the 6th of January, 1868, the Legislative Assembly of this Territory at a regular and lawful session, passed a general incorporation act, entitled "An act to regulate incorporations," which, among other things, provided for the incorporation of railroad companies.   Under it, the Dakota South-

ern Railroad Company, in or about April, 1871, became organized, for the construction of a railroad from Sioux City, Iowa, to the city of Yankton, the capital of this Territory.

On the 21st of April, 1871, the Governor of the Territory approved an act, entitled "An act to enable organized counties and townships to vote aid to any railroad, and to provide for the payment of the same."

In the following autumn, to-wit: on the 2d day of September, 1871, in pursuance of said last enactment, at an election then held, a majority of the voters of Yankton county voting on that day, decided to grant a donation of two hundred thousand dollars to aid the said railroad company, in bonds of said county, payable in twenty years, bearing eight per cent. interest, the interest payable semi-annually. But doubts arose as to the above legislation.

In the first place, although the Organic act had conferred on the assembly legislative power co-extensive with all rightful subjects of legislation, not inconsistent with the Constitution and that act, yet Congress on March 2, 1867, enacted that the Legislative Assemblies of the several Territories shall not grant private charters or especial privileges, with the exception, however, that they may, by general incorporation acts, permit persons to associate themselves together *as bodies corporate*, for *mining, manufacturing, and other industrial pursuits.*

This last named act of Congress created the doubt as to the validity of the Territorial act of January 6, 1868, in relation to the incorporation of railway companies.

In the next place, the validity of the Territorial act of April 21, 1871, was questioned. The regular session of the Assembly was over. It had convened on the 5th of December, 1870, and had concluded its allotted term of forty days on the 13th of January, 1871. The members of that regular session had been chosen for the term of two years, and the sessions could only be biennial. The session in April was an extraordinary one; it had been called by a proclamation of the acting Governor; and his right to do so was doubted or denied.

In this juncture of affairs, Congress was appealed to, and its power invoked to ratify transactions performed under color of the said Territorial enactments. In other words, Congress was asked to make a law to cure all defects of power in said enactments passed by the direct or reputed representatives of the people, and to heal all irregularities.

Accordingly, Congress on May 27, 1872, enacted a law, entitled—

"An act in relation to the Dakota Southern Railroad Company.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the act passed by the Legislative Assembly of the Territory of Dakota, and approved by the Governor on the twenty-first day of April, eighteen hundred and seventy-one, entitled " an act to enable organized counties and townships to vote aid to any railroad, and to provide for the payment of the same," be and the same is hereby disapproved and annulled, except in so far as is herein otherwise provided. But the passage of this act shall not invalidate or impair the organization of the company heretofore organized for the construction of the Dakota Southern railroad, leading from Sioux City, Iowa, by way of Yankton, the capital of said Territory, to the west line of Bon Homme county, or any vote that has been or may be given by the counties of Union, Clay, Yankton and Bon Homme, or any township granting aid to said railroad, or any subscription thereto, or anything authorized by and that may have been done in pursuance of the provisions of the aforesaid act of the Legislative Assembly of said Territory toward the construction and completion of said railroad; and the said Dakota Southern Railroad Company, as organized under and in conformity to the acts of the Legislative Assembly of said Territory, is hereby recognized and declared to be a legal and valid corporation; and the provisions of the act of the said Legislative Assembly first aforesaid, so far as the same authorize, and for the purpose of validating any vote of aid and subscriptions to said company for the construction, completion and equipment of the main

stem of said railroad, between the termini aforesaid, are hereby declared to be and remain in full force, but no further, and for no other purpose whatsoever.

Sec. 2. That for the purpose of enabling the said Dakota Southern Railroad Company to construct its said road through the public lands between the termini aforesaid, the right of way through the said public lands is hereby granted to said company to the extent of one hundred feet in width on each side of said road: *Provided*, That nothing in this act shall relieve said Dakota Southern Railroad Company from constructing and completing said railroad in accordance with the conditions and stipulations under which the citizens of the counties therein named, voted aid to said railroad in accordance with the laws of said Territory, approved April twenty-first, eighteen hundred and seventy-one: *Provided further*, That said Dakota Southern Railroad Company shall issue to the respective counties and townships, voting aid to said railroad, paid up certificates of stock in the same in amounts equal to the sums voted by the respective counties and townships."

Very shortly thereafter, to-wit: on the 10th day of June, 1872, it passed another curative act, as follows: "That the "first section of an act, approved March 2d, 1867, entitled "An act amendatory of 'An act to provide a temporary gov-"; ernment for the Territory of Montana,' approved May 26, 1864, so far as relates to *incorporations which have been*, or which may hereafter be, created and organized for the business of mining, manufacturing, or other industrial pursuits, or the construction or operation of railroads, wagon roads, irrigating ditches, and the colonization and improvement of lands in connection therewith, or for colleges, seminaries, churches, libraries, or any benevolent, charitable, or scientific association, and for all rightful subjects of legislation consistent with the Constitution of the United States, under the general incorporation laws of any Territory of the United States, *shall be construed as having authorized*, and as authorizing the Legislative Assemblies of the Territories of the United States, *by general* incorporation acts, to permit persons

to associate together as bodies corporate for purposes above named."

After the passage of these acts of Congress, *i. e.*, on the first day of July, 1872, the board of county commissioners of Yankton county, acting in behalf of the county, executed bonds of the county to the amount of two hundred thousand dollars, payable twenty years after that date, bearing interest at the rate of eight per cent. per annum, payable semi-annually, and which interest is represented by coupons attached to the bonds, which bonds were afterwards, and during that year, and the year 1873, issued and delivered to the railroad company, in pursuance of the said disputed Territorial enactment of April 21, 1871, and of the said legislation by Congress.

It is no where alleged that the election held on the second day of September, 1871, was not held or conducted in the manner, and according to the directions, prescribed in the enactment of April 21, 1871.   There is no charge of unfairness, or fraud, as respects the election.   It is admitted that a majority of the electors, voting at said election, did vote to extend the aid of the county, to that railroad company, by a donation, or gift, to the said amount, and that the bonds of the county should be issued therefor, the principal to be payable in twenty years, and the interest of eight per cent. payable semi-annually.

The enactment of April 21, 1871, was a general one, applicable to all organized counties and townships in the Territory; and the fifth section thereof declares that " if a majority of the electors, voting at such election, vote for the issue of bonds, the board of county commissioners shall cause such bonds as may be required by the terms of said vote, to be issued and delivered in accordance with section second of this act, in the name of such county or township, to be signed by the chairman of the board of county commissioners, and attested by the register of deeds, under the seal of the county." And the sixth section is this—" whenever any bonds shall be issued in pursuance of the foregoing provisions, it shall be the duty of the board of county commissioners, annually to

proceed to levy and collect a tax on all the taxable property of the county or townships voting such tax, sufficient to pay the interest on said bonds: *Provided*, That no more than two per cent. of the assessed valuation of the property in any county or township, shall be raised in any one year under the provisions of this law, either for the payment of interest or bonds." The next sections provide for a sinking fund, and for the collection of the tax as county taxes are collected, and payment by the treasurer on presentation of the coupons, etc.

It is alleged that the session of the Assembly, at which the act of April 21, 1871, was passed, was wholly without authority of law; secondly, that the act itself was and is wholly illegal, nugatory and void; thirdly, that the vote of aid, and all proceedings thereunder, are and were inoperative and void; fourthly, that the said railroad company is a private corporation organized and operated solely for private gain; and, fifthly, that the act of Congress of May 27, 1872, so far as it operates to validate or authorize the taking of property by taxation or otherwise, for the benefit of said corporation, is invalid and of no binding force or effect.

A solution of these objections may be reached, by considering their main features. And in the first place, it is a well established principle that debts contracted by municipal corporations must be paid, if paid at all, out of taxes which they may *lawfully* levy; and that all contracts by them, creating debts to be paid in future, (not limited to payment from some other source) imply an obligation to pay by taxation. The right of a county, or township, to contract a debt, must, therefore, be limited by its right to tax.

If in the case before us, no tax can lawfully be levied to pay the debt, the contract itself is void for want of authority to make it. The validity of a contract which can only be fulfilled by a resort to taxation, depends on the power to levy a tax for that purpose.

It is settled, by a vast weight of authority, that the building of a railroad is for a *public* purpose. Debts created by counties and other municipalities, in aid of railroad companies, are held to be valid on the ground that the purpose

for which the taxes to pay them are levied, is for a public use, and for a purpose or object which it is the right and duty of the government to assist, by money raised from the people by taxation. Railroad corporations have the power to obtain right of way; they are subject to the laws which govern common carriers; these roads are established as post-roads; and, therefore, they possess these and the like characteristics of a *public* nature.

If Congress authorizes counties in a Territory to contract debts in aid of a railroad, it must intend to authorize them to levy such taxes as are necessary to pay the debts, unless there is in the act itself, or in some general statute, a limitation upon the power of taxation which repels such an inference. These general views prepare the way for an inquiry into the chief objection urged—namely, has Congress the constitutional power to enact such a law as the act of May 27, 1872?

And first, what are the sources of the power of Congress to legislate for a Territory of the United States, and what is the extent of that power?

In the case of the *American Insurance Co. v. Canter*, 1 Peters, 511, the sources of the power of Congress to legislate for a Territory were referred to by Chief Justice Marshall. He said that " the Constitution confers absolutely on the government of the Union the powers of making war and of making treaties; consequently, that government possesses the power of acquiring territory either by conquest or treaty." Again he remarked upon that clause of the Constitution which empowers Congress to make all needful rules and regulations respecting the territory or other property of the United States, and leaving the true source of the power as between the two an open question, he remarked that " perhaps the power of governing a Territory belonging to the United States, which has not, by becoming a State, acquired the means of self-government, may result necessarily, from the facts that it is not within the jurisdiction of any particular State, and is within the power and jurisdiction of the United States. The right to govern may be the inevitable consequence of the

right to acquire territory.  *Which ever may be the source whence the power is derived, the possession of it is unquestioned.*"  That is to say, without specifying or deciding whether the power arises by necessary implication from the right to acquire territory, or whether it proceeds from the express words " to make all needful rules and regulations respecting the territory," the possession of the power is admitted and cannot be questioned.

In the case of *Dred Scott v. Sandford*, 19 How., 393, Taney, C. J., in reference to the case of the *American Insurance Co. v. Canter*, said: " It is thus clear, from the whole opinion on this point, that the court did not mean to decide whether the power was derived from the clause in the Constitution, or was the necessary consequence of the right to acquire.  They do decide that the power in Congress is unquestionable, *and in this we entirely concur*, and nothing will be found in this opinion to the contrary.  The power stands firmly on the latter alternative put by the court—that is, as *the inevitable consequence of the right to acquire territory.*"

Mr. Justice Curtis, on the contrary, deduced the power of Congress to govern the Territories, not from the right to acquire, but from the power expressly granted to make all needful rules and regulations.  He put it on the ground that as " this is a grant of power to Congress, that it is therefore necessarily a grant of power to legislate; and, certainly, rules and regulations respecting a particular subject, made by the legislative power of a country, can be nothing but laws.  Nor do the particular terms employed, in my judgment, tend in any degree to restrict this legislative power.  Power granted to a legislature to make all needful rules and regulations respecting the territory, *is a power to pass all needful laws respecting it.*"  And again: " The question whether a particular rule or regulation be needful, must be finally determined by Congress itself.  Whether a law be needful, is a legislative or political, not a judicial question.  Whatever Congress deems needful is so, under the grant of power."  And further: " I cannot doubt that this is a power to govern the inhabitants of the Territory, by such laws as Congress deems needful,

until they obtain admission as States.    Whether they should be thus governed solely by laws enacted by Congress, or partly by laws enacted by legislative power conferred by Congress, is one of those questions which depend on the judgment of Congress—a question which of these is needful."

But in the present case, the source of the power of Congress is unimportant.    In the Dred Scott case, the majority of the court admitted that, under the implied authority, Congress has power to organize and govern the Territories until they arrive at a suitable condition for admission to the Union; they admitted, also, that the kind of government which shall thus exist should be regulated by the condition and wants of each Territory, and that it is necessarily committed to the discretion of Congress to enact such laws for that purpose as that discretion may dictate.    And Taney, C. J., in his opinion—save as to property in slaves—points out no limits to that discretion, save only those which are found in the Constitution itself.    (See article I, section IX; also Amendments to the Constitution.)

Mr. Justice Catron, in a vigorous review of the source of the power, held "that Congress is vested with power to govern the Territories of the United States by force of the third section of the fourth article of the Constitution.    (*Scott v. Sandford*, supra; *Cross v. Harrison*, 16 How., 193.)

Mr. Justice McLean held likewise, declaring that the power to make all needful rules and regulations is a power to legislate, because Congress cannot make " rules and regulations " except by legislation.    In referring to the criticism of Taney, C. J., on the opinion of Marshall, C. J., in the case of the *Ins. Co. v. Canter* (supra) Justice McLean said—" I can see no want of precision in the language of the Chief Justice; (Marshall) his meaning cannot be mistaken.    He states, first, the third section as giving power to Congress to govern the Territories, and two other grounds from which the power may also be implied.    The objection seems to be, that the Chief Justice (Marshall) did not say which of the grounds stated, he considered the source of the power.    He did not specifically state this, but he did say, " *which ever may be* the source

whence the power is derived, *the possession of it is unquestioned.* No opinion of the court could have been expressed with a stronger emphasis; the power in Congress is unquestioned. But those who have undertaken to criticize the opinion, consider it without authority, because the Chief Justice (Marshall) did not designate specially the power. This is a singular objection. If the power be unquestioned, it can be a matter of no importance on which ground it is exercised."

And Mr. Justice Campbell, in same case, page 514, in illustrating the scope and operation of the third section of the fourth article of the Constitution, states that "this clause in the Constitution does not exhaust the powers of Congress within the Territorial subdivisions, or over the persons who inhabit them. Congress may exercise there all the powers of government which belong to them as the Legislature of the United States, of which these Territories make a part. (*Loughborough v. Blake*, 5 Wheat., 317.) Thus the laws of taxation," etc., "are as operative there as within the States." And again he says—"I admit that to make the bounds for the jurisdiction of the government of the United States within the Territory, and of its power in respect to persons and things within the municipal subdivisions it has created, is a work of delicacy and difficulty, and, in a great measure, is beyond the cognizance of the judiciary department of that government."

Kent, in Vol. 1, page 421, of his Commentaries, declares that "with respect to the vast Territories belonging to the United States, Congress have assumed to exercise over them supreme powers of sovereignty. Exclusive and unlimited power of legislation is given to Congress by the Constitution, and sanctioned by judicial decisions." And again, "the general sovereignty existing in the government of the United States over its Territories, is founded on the Constitution which declared that Congress should have power to dispose of and make all needful rules and regulations respecting the Territories, or other property belonging to the United States."

Mr. Abbott, in his work on U. S. Practice, (Vol. 1, page 185) says that "in legislating for the Territories, or the District of Columbia, Congress exercises *an exclusive power* of legisla-

tion, under the general authority given by the Constitution in respect to the territory belonging to the United States."

In Story on the Constitution, (Vol. 2, § 1325) it is said that "no one has ever doubted the authority of Congress to erect Territorial governments within the territory of the United States, under the general language of the clause, "to make all needful rules and regulations.". And in section 1328 it is further remarked, that "the power of Congress over the public territory is clearly *exclusive* and *universal;* and their legislation is subject to no control, but is absolute and unlimited, unless so far as it is affected by stipulations in the cessions, or by the ordinance of 1787, under which any part of it has been settled."

If then Congress possesses the power of exclusive legislation in and over the Territory of Dakota, it must follow that Congress also inclusively possesses the power of taxing the Territory. The grant to Congress of exclusive legislation over a Territory, necessarily implies the power to impose taxes for the public purposes of the Territory. The power thus to tax needs not to be particularly specified or expressed. It is inherent in every sovereignty. No constitutional government can exist without it.

In the case of *Providence Bank v. Billings*, 4 Peters, 561, Marshall, C. J., said—"the power of legislation, *and consequently of taxation*, operates on all persons and property belonging to the body politic. This is an original principle which has its foundation in society itself. It resides in the government as part of itself, and need not be reserved where property of any description, or the right to use it in any manner, is granted to individuals or corporate bodies. However absolute the right of any individual may be, it is still in the nature of that right that it must bear a portion of the public burdens, and that portion must be determined by the Legislature. This vital power may be abused; but the interest, wisdom, and justice of the representative body, and its relations with its constituents, furnish the only security against unjust and excessive taxation, as well as against unwise taxation." And again the same Judge says, in *McCullock*

*v. Maryland*, 4 Wheat., 430, it is "unfit for the judicial department to inquire what degree of taxation is the legitimate use, and what degree may amount to the abuse, of the power."

In the case of *Loughborough v. Blake*, 5 Wheat., 317, a question was made whether Congress had constitutionally a right to lay a direct tax, according to the rule of apportionment, on the District of Columbia, under the prohibition in subdivision 4, of section IX of article I,—"no capitation or other direct tax shall be laid, unless in proportion to the census or enumeration herein before directed to be taken."

After a clear and elaborate argument on the power of Congress as to this right, the following words are found in the opinion: "If the general language of the Constitution should be confined to the States, still the sixteenth paragraph of the eighth section gives to Congress the power of exercising exclusive legislation in all cases whatsoever within this district. On the extent of these terms, according to the common understanding of mankind, there can be no difference of opinion." What is this but declaring that any grant of exclusive legislation, carries with it the power to impose taxes? What is this but saying that, apart from any interpretation by legal minds, the common sense of mankind so construes such a grant?

Exclusive legislation in the district, or in a Territory, must mean such legislation as is suitable or needful in the government of such particular portion, or locality, of the whole domain termed the United States, in contradistinction to that other kind of legislation which embraces the entire community thereof. In respect to the latter, "Congress shall have power to lay and collect taxes, duties, imposts, and excises, to pay the debts and provide for the common defense and general welfare of the United States; but all duties, imposts, and excises shall be uniform throughout the United States," thus laying down the rule of uniformity, as well as that of apportionment above referred to, concerning direct taxation. But this power relates to general taxation throughout the Republic for purposes appertaining to its general welfare.

But whence is derived, and who has, the power to tax the District of Columbia, or the Territory of Dakota, for its local purposes, and for its local welfare? The answer is, that the people of the United States ordained and established a Constitution, in which, and by which, the power of exclusive legislation, and, consequently, the power to tax, were granted to Congress over this Territory, as well as over the district, for all local objects and purposes.

The people of the United States permitted their representatives to tax a part of the society, organized under the Constitution, which is in a state of infancy advancing to manhood, and looking forward to complete equality as soon as that state of manhood shall be attained—as well for municipal or Territorial purposes, as for strictly natural objects.

The history of the legislation of Congress over the District of Columbia, abundantly exhibits and proves this marked division of the taxing power. In the one case, for national purposes, under the general power, contained in section eight, article 1, Congress has laid the taxes in proportion to the census; and duties, imposts and excises, under the rule of uniformity. In the other case, for strictly Territorial or municipal purposes, apart altogether from national objects, Congress imposed taxation on the particular subdivision, by virtue of its power of exclusive legislation, thereby exercising a power parallel to that of a State government. And this may serve to show the meaning of Marshall, C. J., in the case in 1 Peters, above quoted, in which that eminent Judge said that "in legislating for them" (the Territories) "Congress exercises the combined powers of the general and of a State government."

Congress asserted its undisputed sovereign power, when, in the legislative grant contained in the Organic act of this Territory, it put certain restrictions or limitations upon the power of the Legislative Assembly in reference to the subject of taxation. And so likewise in regard to the District of Columbia. A Territory is, as it were, a vast municipal or public corporation, created by Congress, and deriving all its powers from the source of its creation. It is a great body politic and cor-

porate, invested with subordinate legislative powers, to facilitate the due and proper administration of its own internal affairs, and to promote the general welfare of the municipality. Of itself it has no inherent jurisdiction to make laws, or to adopt governmental regulations; nor can it exercise any other powers in that regard than such as are expressly or impliedly derived from its charter or Organic act, or other act of Congress. And as with a mere ordinary municipal corporation in a State, so with a Territory, it is settled law, that the Legislature in granting the specific authority does not divest itself of any power over the inhabitants of the district which it possessed before the charter was granted, or the Organic act was passed. Unless the Constitution otherwise provides, the Legislature still has authority to amend the charter of such a corporation, to enlarge or diminish its powers, extend or limit its boundaries, divide the same into two or more, and to overrule its action whenever it is deemed unwise, impolitic, or unjust. (Cooley on Const., 2d Ed., 192.) The charters of such public corporations may be changed, modified, or repealed, as the public welfare may demand. (2 Kent Com., 305; 1 Greenl. Ev., 12th Ed., § 331; *Russel v. Reed*, 27 Penn. St., 170.)

This conclusion is reached, that as Congress has the power of exclusive legislation over this Territory, within which is necessarily included the right of taxation, therefore the Act of Congress of May 27, 1872, entitled " An act in relation to the Dakota Southern Railroad Company," is valid and constitutional.

The next consideration is as to the scope and effect of this act of Congress. It begins by terming the body of men who passed the Territorial enactment of April 21, 1871, as " the Legislative Assembly of the Territory of Dakota." As Congress was about to legislate on this Territorial act, they knew its origin and history, and had, of course, the whole body of it before them; and all its features, bearings and results were duly scanned and considered. Its title was "An act to enable organized counties and townships to vote aid *to any railroad*, and to provide for the payment of the same." It

was, as has been remarked, a general act, applicable to all counties in the Territory, and to any railroad. In this shape, at least, Congress was averse to it; and it was accordingly disapproved and annulled, except in so far as Congress, in its wisdom, otherwise provided. The Territorial enactment thus became narrowed down to such transactions as had occurred, or might occur, between the voters of the counties of Union, Clay, Yankton and Bon Homme, and one railroad company, to-wit: the Dakota Southern. Contracts and engagements before that time made and entered into, between the parties specified, or that might thereafter be made, were sanctioned, approved and authorized. Any vote that had been given by the county of Yankton; granting aid to the said railroad, or any subscription thereto, or anything authorized by, and that had been done in pursuance of, the provisions of the Territorial act, toward the construction and completion of this particular railroad, was saved and reserved out of the general disapproval, and declared valid. And all the provisions of the Territorial act, so far as they authorize any vote of aid and subscriptions to the said railroad company, were declared to be and remain in full force. The purpose is clearly expressed by Congress, *i. e.*, to validate past transactions, done in pursuance of the Territorial enactment, between the said railroad and the specified voters.

The act of the Legislative Assembly, thus denuded of its public or general character, became, by the ratification of Congress, a private statute, concerning only a particular railroad company and a few municipalities. And the Supreme Court of the United States has repeatedly recognized the validity of private, curative statutes, and given them full effect, where the interests of private individuals were alone concerned, and were largely involved and affected. In *Satterlee v. Matthewson*, 2 Peters, 380, it was asserted that retrospective laws, which do not impair the obligation of contracts, or partake of the character of *ex post facto* laws, are not condemned or forbidden by any part of the Constitution.

In *Wilkinson v. Leland*, 2 Peters, 627, it was admitted that the act was retrospective, and yet gave validity to a void

transaction. (See, also, *Watson v. Mercer*, 8 Peters, 88; *Leland v. Wilkinson*, 10 ibid, 294; *Charles River Bridge v. Warren Bridge*, 11 ibid, 420; *Stanley v. Colt*, 5 Wall., 119; *Croxall v. Shererd*, ibid, 268.)

Cooley on Const. Limitations (page 374) says, that legislative acts validating invalid contracts have been sustained; and that when these acts go no further than to bind a party by a contract which he has attempted to enter into, but which was invalid by reason of personal disability on his part to make it, or through neglect of some legal formality, or in consequence of some ingredient in the contract forbidden by law, they cannot well be obnoxious to constitutional objection. The same author, under the head of "Retrospective Laws," in referring to contracts by municipal corporations, which, when made, were in excess of their authority, but subsequently have been confirmed by legislative action, states that "if the contract was one which the Legislature might *originally* have authorized, the case falls within the rule we have laid down, and the legislative action is to be sustained. Some of the cases where municipal subscriptions in aid of railroads were held valid, were cases where the original undertaking was without authority of law, and was confirmed by retrospective act of legislation." (Referring, *inter alia*, to *Thompson v. Lee County*, 3 Wallace, 327.)

But still more important is the case of *Beloit v. Morgan*, 7 Wallace, 619, in which it was held "that in cases of bonds issued by municipal corporations, under a statute upon the subject, *ratification* by the Legislature is in all respects equivalent to *original authority*, and *cures all defects of power*, if such defects existed, and all irregularities in its execution." (See, also, *Bissell v. City of Jeffersonville*, 24 How., 295; *Ritchie v. Franklin County*, 22 Wall., 68.)

The contract between the county of Yankton and the railroad company in question, was one which Congress might originally have authorized, and therefore the congressional action of May, 1871, ratifying the same, must be sustained. By the fifth section of the ratified act, it became the duty of, and it was obligatory on, the board of county commissioners

to issue and deliver the bonds to the railroad company, if a majority of the electors voting at an election held in pursuance of the local act, had so decided; and to issue them in conformity to the amount specified by a majority of the ballots, and to the terms of payment, to the interest, extent of time, etc., thus voluntarily agreed upon. And in the view I have taken of this case there is no substantial difference between a vote of donation to aid a railroad, and a subscription to its capital stock.

But there is another point in the case which should receive consideration. The complaint shows that the bonds have been issued and delivered to the railroad company, with coupons attached representing the interest. It shows they were executed, issued and delivered in 1872 and 1873. And yet the railroad company has not been made a party defendant to this suit. The company is, so far as it appears, directly interested in the result; or, as is shown, the company has rights which must necessarily be affected by the judgment of this court. The opinion of the majority of the court ignores all claims of the company, and even of innocent holders. The absence of such party may be objected to, and taken at any time upon the hearing, or in the appellate court. Our local statute provides that " the court may determine any controversy between the parties before it, when it can be done without prejudice to the rights of others, or by saving their rights; but when a complete determination of the controversy cannot be had without the presence of other parties, the *court* must cause them to be brought in."

Here is a case in which this court undertakes to decide upon the rights of a party acknowledged to possess bonds in question to the amount of two hundred thousand dollars, in the absence of such party, and without any allegation that he is beyond our jurisdiction.

What rights and equities the railroad company may have, apart from the present display of the case, we know not; but surely before deciding, a party like this should be heard, or his absence regularly accounted for. (1 Peters, 299; 17 How., 130; 19 How., 113.)

From the issuing of these bonds in 1872 until the bringing of this action in 1875, the county commissioners have annually levied a tax, designated as the railroad tax, for the purpose of paying the interest—and in none of these years has the levy exceeded two per cent. of the assessed valuation of the property. This has been done in pursuance of the sixth section of the ratified act of the Assembly. It would seem, therefore, that there has been acquiescence until this suit, which is one brought by a single taxpayer.

The plaintiff asks that the railroad tax levied on his property to pay the interest, may be declared illegal and void, and that the county and its agents may be perpetually enjoined from proceeding to collect such tax. The defendants, namely, the county itself and its treasurer, demurred to the complaint, for that the complaint does not state facts sufficient to constitute a cause of action. In other words, the county resists, by its pleading, the prayer of the plaintiff, and thereby, on this record, impliedly admits that the tax is lawful and valid, and, consequently, opposes the granting of the injunction.

I fully concur with the county and its financial agent in the view thus presented by their demurrer, and I hold, in accordance therewith, that the complaint does not state facts sufficient to give the plaintiff a cause of action.

The judgment of the District Court, which sustained the defendants' demurrer, and dismissed the complaint, should, in my opinion, be *affirmed*.