THE CITY OF LOU-
ISVILLE.
vs
HYATT, et al.

---

# The City of Louisville *vs* Hyatt *et al.*

## ERROR TO THE LOUISVILLE CHANCERY COURT.

*Louisville City Charter.    Constitutional Ordinances.*

CHIEF JUSTICE ROBERTSON delivered the Opinion of the Court.

CHANCERY

*Case* 62.

*May* 24, 1841.

Provisions of the Louisville charter.

THE 9th section of the charter of the City of *Louisville*, (1828,) re-enacted and in force yet, provides, "that "the mayor and council shall have power and authority "to cause and procure all the streets and alleys, now es- "tablished, or hereafter to be established, to be paved and "turnpiked at the costs and expense of owners of lots "*fronting such streets or alleys*, and a petition of the "owners of a majority of lots or parts of lots *fronting on* "*any square*, shall be sufficient to authorize a contract "for paving or turnpiking the streets or alleys in such "square; *Provided*, however, the mayor and council, by "*their unanimous consent in council*, may cause any "street or alley, in any square in said city, to be paved, "&c. at the cost, &c. of the owners of lots, &c. *fronting* "*such streets or alleys*, without any petition, and when "such paving, &c. shall be completed, they shall appor- "tion the costs, &c. equally on the lot holders, and a lien "is hereby created on the lots, &c. for the same."

The city of Lou-
ISVILLE
vs
Hyatt et al.

The 10th section of the charter makes the same provisions in reference to "grading, filling up, and levelling streets;" and an act of 1836 authorizes a suit in chancery for enforcing the statutory lien.

It will be seen, on comparison, that the provisions of the 9th section of the charter of *Louisville* are substantially the same as those of the 11th section of the charter of *Lexington*, as quoted and expounded by this Court in the case of *The City of Lexington* vs *M'Quillon's heirs*, (9 *Dana*, 514;) and, therefore, the same authority being given to the mayor and council of each of those cities, by the 9th section of the charter of the one city and the 11th section of the charter of the other city, so far as it may be constitutional, when exercised by *Lexington*, it must be equally so when exercised in the like manner, by *Louisville*.

*This Court will not decide an act of the Legislature to be unconstitutional on a mere doubt, but they must be clearly satisfied that it is so.*

And although we frankly admit that we have never been perfectly satisfied as to the constitutional validity of the power involved and considered in the case of *The city of Lexington* vs *M'Quillon's heirs, supra*, yet still feeling, as we did when we decided that case, that *we* are not able to perceive clearly or to prove satisfactorily that the Legislature, in enacting the 11th section of the charter of *Lexington*, transcended the boundaries of legislative power prescribed by the supreme organic law of the State, it does seem to us that we should be justly chargable with wandering from the appropriate sphere of the *judiciary department*, were we, by a subtle elaboration of abstract principles and metaphysical doubts and difficulties, to endeavor to show that such a power may be questionable, and on such unstable and unjudicial ground, to defy and overrule the public will, as clearly announced by the legislative organ. Whenever this Court shall be well convinced that a legislative act is unconstitutional, it should not hesitate to pronounce it so, and therefore, to disregard it as void. But the *policy* and *justice* of legislation belong, not to judicial but to legislative discretion. And to merely *doubt* legislative power is not enough to justify judicial resistance.

*The decision of City of Lexing-*

We do not feel inclined, therefore, to retract or essentially qualify the opinion in the case of *The city of Lex-*

_ington_ vs _M' Quillon's heirs_, neither subsequent reflection nor argument having, in any degree, shaken our judgments as to the correctness of it.

In that opinion we suggested that, _so far as improvement of streets may be concerned_, the charter had virtually subdivided the city into subordinate _quasi_ municipalities or communities, each consisting of the lot holders in a defined square—and is not this substantially true? Does not the charter of each of the cities of _Lexington_ and _Louisville_, authorize "the owners of a majority of lots or parts of lots fronting on any square," to require the improvement of any street bounding their square, at the expense of all the owners of ground on their portion of that street, and also authorize the mayor and council, by unanimous vote in council, to make the like improvement of fractions of streets by squares, at the like distributive cost of the local proprietors? And in this anomalous provision, in one aspect of it so democratic and in the other so carefully guarded against oppression or gross injustice, we have been unable to perceive any sufficient ground for deciding that the fundamental law of the State has been violated; and we presume that, in the prudent exercise of this police authority, unreasonable inequality of burthen will rarely, if ever, be imposed, considering the past and prospective improvement of the several squares in the same prescribed mode.

But in this case, on a bill filed by a contractor against several owners of ground on a street fronting their square in _Louisville_, for enforcing payment of the sums assessed against them respectively, for improving that portion of the street without their consent, but under an ordinance of the mayor and council, the Chancellor decided that the provision in the charter which purports to authorize the imposition of such a local burthen is unconstitutional, and, therefore, he dismissed the bill as against the proprietors and rendered a decree in the contractor's favor against the corporation itself, which was also a party defendant.

And, in that opinion, the learned Chancellor, in criticising, as he was pleased to do, the suggestion as to the subdivision, as just defined, of the aggregate municipali-

THE CITY OF LOUISVILLL _vs_ HYATT _et al._

ton vs _M' Quillon's heirs_, cited and approved, (Somnus and Luna and a cave _in terrorem_) notwithstanding.

For the Legislature to authorize a majority of the owners of lots on a square in Louisville or Lexington, to decide that certain grading and improvements shall be done at the expense of the lot holders, or that by the decision of the unanimous vote of the mayor and council, such improvement shall be so made, is not unconstitutional.

THE CITY OF LOU-
ISVILLE
vs
HYATT et al.

ty, and characterising such a corporation as *Briarian,* thought fit to illustrate his conviction of its absurdity, in the following manner: "But as the giant *Briarius* of "fifty *heads!!* was buried under *Mount Ætna* for his "crime in assisting the *Giants* against the Gods, so this "gigantic corporation of more than one hundred and fifty "heads, (son of *Somnus and Luna*) ought to be buried un- "der poppies in a cave, where the sun never penetrates, "for warring against the constitution and common sense." We could not wander so far from the judicial path as to reply to the venerable Chancellor's misapplied apologue, from the most fanciful of Grecian poets of old; we have thought proper to quote it for publication in our legal reports, only as an illustrative episode to a constitutional argument by a *patriarchal jurist.* But, not acknowledging *mythology* to be law nor *Hesiod* to be authoritative on a question of political power in *Kentucky,* we must still adhere to the opinion in *The City of Lexington* vs *M' Quillon's heirs, Somnus* and *Luna,* and the *poppies,* and even cave, *in terrorem,* notwithstanding.

But the order for grading the street in this case, does not expressly show that it was adopted "by the unanimous consent of the mayor and councilmen," in council, and, on this ground also, the Chancellor has decided that no legal authority for the graduation has been shown.

The charter re-
quired unanimity
in the mayor and
council to make
an ordinance;
the allegation
that it was "duly
made by the
mayor and coun-
cil," in the ab-
sence of proof to
the contrary,
deemed *prima
facie,* sufficient,
though such an
ordinance may
be impeached.

There is neither any direct allegation nor extraneous proof of such unanimity, and without an unanimous vote of all the councilmen and the mayor in council, the order was illegal and void. This is one of the chief conservative principles of the charter on this important subject, and should, therefore, be strictly enforced. The bill, however, alleges that the order was "duly made," the copy of it, as exhibited, imports that it was made in council, "by the mayor and council," and the answers, though they deny the constitutional validity of it on other grounds, do not suggest any doubt as to a want of the required unanimity.

Upon such a bill and such answers, we are of the opinion that the order, as exhibited, should, *prima facie,* be presumed to have been made in the mode prescribed by the charter. As functionaries, acting openly for the wel-

fare of the local public and under official responsibility, <span>Thl City of Lou-<br>isville<br>vs<br>Hyatt et al.</span>
the acts of the mayor and council should, in some de-
gree, be accredited as regular and legal: usurpation with-
out an apparent motive, should not be presumed; una-
nimity was indispensable to the legal authority to make
the order—the order was made "by the mayor and coun-
cil," and, therefore, upon the pleadings in the case, we
feel authorized to presume that the order was made by
the unanimous vote of the mayor and councilmen "in
council:" *Angel on Corporations*, 290; *Commonwealth*
vs *Welper*, 3 *Serg. and Rawle*, 29.

The order, however, as entered on the municipal jour-
nal, is not conclusive. It may be impeached and shown,
by extraneous proof, to be void for want of the unanimi-
ty required by the charter; for, though the entries in the
corporation books may be evidence against the corpora-
tors, it is not conclusive: *Angel*, 289–91, and the case
of *St. Mary's Church*, 7 *Sergt. and Rawle*, 530.

Nor do we concur with the Chancellor in the opinion
that there was no sufficient proof that the street was le-
gally established, or was within the jurisdiction of the
city authorities; an order for opening it had been made
upon notice to *Cosby*, who held the only beneficial inter-
est in the ground, and it has since been recognized as a
street and used as such by the holders of the property on
each border of it. All this is, we think, sufficient for
this case.

The necessary consequence of the foregoing view of
the case is that, as the local law authorized a bill in chan-
cery by the contractor against all recusant lot holders for
their distributive portions of the price of his work on
the street opposite their squares, there is error in the de-
cree dismissing the bill against them in this case, and in
rendering a decree against the corporation—the contract
binding the mayor and council only to make an assess-
ment and give orders on the proprietors, as they had done
before the bill was filed.

The contract was for the cutting and grading of the <span>Grading and re-<br>moving dirt at<br>25 cents per<br>"square yard,"<br>means cubic<br>yard.</span>
street "preparatory to paving," and stipulated for the pay-
ment of 25 cents "*per square yard*," for cutting, grading
and removing the dirt. That portion of the street asses-

THE CITY OF LOU-
ISVILLE
vs
HYATT et al.
sed in this case, was 490 by 90 feet, and the width of an intersecting street in addition thereto. The excavation was from five to seven feet, and the city engineer assessed the total contract price therefor at $3024 75, the whole of which, excepting so much only as was allowed for the intersecting street, was distributed *pro rata*, among the owners of ground on each border of the street.

But the Chancellor, construing the contract as entitling the undertaker to only 25 cents "per square yard," according to *superficial* mensuration, reduced the assessment to $1200, that sum being 25 cents a yard for the superficial contents of 490 by 90 feet. A square yard, when applied to a *surface*, means, of course, superficial measure, but when applied to a solid, it might and generally would import solid measure or a yard every way, according to the subject of mensuration; and, therefore, as an excavation of unascertained extent in depth was the subject matter of the contract in this case, the "square yard," though abstractly it would mean a superficial yard, may have been, and probably was, intended to mean, synonimously with cubic yard, the square yard or yard every way of the solid contents of the excavated ground. And this interpretation would be fortified by the fact that the mayor and council and the city engineer seem to have so understood the contract.

But, as this subject is one, concerning which there may be some latent doubt, and as, moreover, it was not directly litigated in the Court below, and the cause will be remanded, we will not now conclude any further and extraneous proof. We here deem it but prudent to suggest that a *gross* abuse of a just and provident discretion, either in agreeing to allow to a stranger, as undertaker, an exorbitant compensation or in refusing to permit the local proprietors to do each his distributive portion of the required work, if they or any of them propose to do so and offer a satisfactory guaranty thereof, might furnish some ground to a court of equity for resisting the stranger's prayer for enforcing the statutory lien against the proprietors, or for reducing the amount and remitting the complainant to the corporation for what he may lose thereby in his suit against the proprietors.

We will only add that, in distributing the burthen of the entire cost of the excavation, each lot-holder on the squares divided by the graded street should be required to pay, not one half of the cost of the grade opposite to his ground, but his aliquot portion of the whole cost estimated according to the relative extent of his lot on the street; and also, that although the mayor and council are the final judges of the *utility* of the prescribed improvement, yet, if any of the proprietors have been damnified, his remedy, if any, is by action and not by resisting the enforcement of the order for graduation.

Decree reversed and cause remanded, for such further proceedings and decree as may be proper, according to the principles of this opinion.

*Owsley* for plaintiff; *Guthrie* for defendant; *Pirtle* for the owners of lots.