[Civil No. 297.   Filed March 24, 1890.]

[23 Pac. 680.]

GEORGE W. CHEYNEY, Petitioner, v. JOHN Y. T. SMITH, Respondent.

1. LEGISLATURES—LENGTH OF SESSIONS—REV. STATS. U. S. 1878, SEC. 1852, AS AMENDED DECEMBER 23, 1880, BY 1 SUPP. R. S. U. S., P. 313, BEING CH. 7, 46TH CONGRESS, 3D SESSION, PAR. 16, ORGANIC ACT, REV. STATS. ARIZ. 1901, CONSTRUED.—Statutes, *supra,* providing that "the sessions of the legislative assemblies of the several territories of the United States shall be limited to sixty days' duration," is mandatory and means a session of sixty legislative or working days, exclusive of Sundays, public holidays, and days of intermediate adjournment, not sixty consecutive days.

2. ORGANIC ACT—RELATION TO GOVERNMENT—CONSTRUCTION.—The organic law of the territory bears the same relation to the government of the territory as the constitution of a state sustains to the people of the state.   The same rules of construction apply to it as to a state constitution.

3. STATUTES—CONSTRUCTION—LEGISLATIVE.—The contemporaneous construction of a constitutional provision put upon it by the authority for whose guidance it was intended, particularly if acquiesced in for a long term of years, should be followed by the courts.

4. SAME—CONSTITUTIONALITY PRESUMED.—A legislative act will be presumed constitutional till the contrary clearly appears.

    WRIGHT, C. J., dissents.

ORIGINAL Application for Writ of Mandamus.

The facts are stated in the opinion.

C. F. Ainsworth, for Petitioner.

Clark Churchill, Attorney-General, for Respondent.

Ben Goodrich, *amicus curiæ.*

SLOAN, J.—The plaintiff herein applies to this court for a peremptory writ of *mandamus* to compel the defendant, as territorial treasurer, to pay the amount of a certain warrant drawn by the territorial auditor in favor of plaintiff, as authorized by subdivision 15 of section 1 of an act commonly known

as the "Appropriation Bill," passed by the fifteenth legislative assembly, and approved by the governor on the tenth day of April, 1889. This action is brought for the purpose of having a judicial determination as to the validity of said act, it being contended that at the date of the passage and approval thereof the fifteenth legislative assembly had no legal existence, for the reason that the limit of time within which it could by the organic law lawfully remain in session had expired, and therefore it had become at said date *functus officio*. The journals show that the fifteenth legislative assembly began its session on the twenty-first day of January, 1889, and adjourned *sine die* upon the tenth day of April, 1889, being the date of the approval of said act. The journals further show that the assembly was in actual session but forty-eight working or legislative days, the last day being denominated the forty-eighth day of the session. The restriction upon the length of the sessions of the legislative assembly is found in section 1852 of the Revised Statutes of the United States, as amended December 23, 1880. Said section, as amended, reads as follows: "The sessions of the legislative assemblies of the several territories of the United States shall be limited to sixty days' duration." Said section being in its terms mandatory, must be so construed. It therefore remains for us to determine which of the two views as to the proper construction to be placed upon said section contended for at the hearing of the case we should adopt, viz., upon the one hand that the session of the legislative assembly is limited therein to sixty consecutive days from the day upon which the assembly convenes; or, upon the other hand, that the session is limited to sixty legislative or working days, exclusive of Sundays, public holidays, and days of intermediate adjournment. After the careful consideration the great public interests involved in this controversy demand, we have arrived at the conclusion that the latter view must prevail.

Said section is part of the organic law of the territory. It is proper to consider, therefore, the relation which the organic act, and other acts of Congress amendatory or supplementary thereto, bear to the government of the territory. It was argued at the hearing of this case that Congress had granted to the legislature of a territory certain limited powers, and

restricted their exercise to the particular mode and manner expressed in its grant; that this grant is in every instance to be strictly construed; and that, the legislature having acted in a particular manner, no inference is to be drawn therefrom that it has theretofore acted within the limit of its delegated powers. We think the true view is that the organic law of a territory bears the same relation to the government of the territory as the constitution of a state sustains to the people of the state. The supreme court in *National Bank* v. *County of Yankton*, 101 U. S. 129, say: "The organic law of the territory takes the place of the constitution as the fundamental law of the local government." If the view we have given be correct, then it follows that the same rules of construction apply, and like effect must be given to any part of the organic law as would apply and be given to a similar provision in the constitution of a state. A well-established rule is that the contemporaneous construction of a constitutional provision put upon it by the authority for whose guidance it was intended, particularly if acquiesced in for a long term of years, should be followed by the courts. See *United States* v. *State Bank*, 6 Pet. 39; *Caldwell* v. *Carrington*, 9 Pet. 103; *Edwards* v. *Darby*, 12 Wheat. 206. That this rule applies to the construction of the organic acts of the territories is asserted by Chief Justice Chase in the case of *Clinton* v. *Englebrecht*, 13 Wall. 434. In speaking of the power of the legislature of Utah to legislate with reference to the practice of the courts in the matter of juries, he said: "This uniformity of construction by so many territorial legislatures of the organic acts, in relation to their legislative authority, especially when taken in connection with the fact that none of these jury laws have been disapproved by Congress, though any of them would be annulled by such disapproval, confirms the opinion warranted by the plain language of the organic act itself, that the whole subject-matter of jurors in the territories is committed to territorial regulation." A provision in the organic law of New Mexico, which by the act organizing the territory of Arizona was made applicable to the latter, was to the effect that no session of the legislative assembly could exceed the term of forty days. The first legislative assembly of the new territory convened, by proclama-

tion of Governor Goodwin, on the twenty-sixth day of September, and remained in session until the tenth day of November, 1864, a total of forty-six consecutive days. Deducting ten Sundays that intervened between the day upon which the assembly first met and the day upon which it finally adjourned, and we find that it was in session forty working or legislative days. After forty consecutive days had expired, the more important acts of the session were passed; among them being what was known as the "Howell Code." Under the provisions of this code of laws, the government of the territory was for the most part administered until it was superseded by the code of 1887. The validity of these laws was never questioned, and the courts, as well as subsequent legislatures, recognized them as equally operative and binding with the other acts of this session. If it be contended that the act of 1880, amending section 1852 of the Revised Statutes is to be construed differently from the provisions of the organic act of New Mexico on the same subject, and that legislative construction upon the latter provision cannot, therefore, be considered, we find that the first legislative assembly to meet after said act took effect, viz., the eleventh legislative assembly, convened upon the third day of January, 1881, and finally adjourned upon the twelfth day of March following, a total of sixty-nine consecutive days. Deducting, as before, the intervening Sundays, and we find that the assembly was in actual session upon sixty working or legislative days. Sixty consecutive days from the beginning of the session ended with March 3d. After said date an act was passed fixing the date for the convening of subsequent legislatures. This act was followed and acquiesced in by succeeding assemblies, until the act of 1887 again changed the date of the beginning of the sessions. Among other acts was one creating the county of Graham: another, providing for the issue of bonds and the levy and collection of taxes; others were passed amending the revenue laws and the statute of limitations. During the session the council directly gave its assent to this legislative construction in rejecting a resolution to adjourn at the end of the sixty consecutive days. Thus the legislative construction from the beginning has been uniform that the sessions are limited to sixty days of actual

session.  In the case of *Moog* v. *Randolph,* 77 Ala. 608, the supreme court of Alabama distinctly recognized the rule that the practical construction of the legislature will govern in a case of this kind, and gave a like construction upon the term "days," in a similar provision of the constitution of that state.

In construing the constitutional provision that the general assembly shall not remain in session longer than fifty days, Justice Somerville in that case said: "I am satisfied that 'fifty days' means fifty legislative working days, exclusive of the Sundays and other days upon which the senate and house concur in refusing to sit by joint resolutions of adjournment.  This question has been repeatedly considered by the judiciary committees of the senate and house of representatives at successive sessions of the general assembly since the adoption of the constitution; and other reports concurring in this view have in each instance been adopted by those bodies.  Even if we regard the question a doubtful one, we would hesitate to depart from this settled legislative construction of the fundamental law, especially in view of the serious consequences which would necessarily flow from it."

But, aside from the legislative construction, we think a consideration of the subject-matter, as well as the evident purpose and intent of the act of 1880, warrants the interpretation we put upon it.  Congress certainly contemplated that emergencies might arise that would render legislation between fixed dates practically impossible.  At any rate, that upon Sundays and holidays no legislation could or would be done. If the purpose was to include these, other language more clearly expressing this intent would very probably have been used.  A distinction should be made between statutes which restrict the number of days upon which acts may be performed and those which merely fix the ulterior limit of time within which a single matter may be transacted.  In the former, Sundays and other days when labor or business cannot be transacted are usually excluded; in the latter, these are usually included, unless expressly excepted.  Thus it has been held that Sundays, not being judicial days, are not to be considered as days of a term of court.  *Read's case,* 22

Gratt. 924; *Bank* v. *Williams,* 46 Mo. 17; *Chicago* v. *Iron Works,* 93 Ill. 223. There appears no good reason why the same rule should not apply to the construction of the term "days," when applied to matters to be transacted by legislative assemblies.

Were we in doubt as to the correctness of the above construction, what would be the duty of the court in the premises? The legislative assembly, a co-ordinate branch of the government of the territory, acting under like solemn obligations and responsibilities with ourselves, has passed the act, the validity of which is in question, which act has been approved by the governor, who has taken a like oath to support the constitution and laws of Congress, and now are we to declare it invalid? If we believe that the legislature, in attempting to legislate after March 21st, clearly, palpably, and plainly violated the fundamental law of the territory, then most unquestionably it is our duty to so declare. While this is true, we must bear in mind that among the fundamentals of the law almost, is the proposition that "we can declare an act of assembly void only when it violates the constitution (or organic law) clearly, palpably, plainly, and in such manner as to leave no doubt or hesitation on our minds." *Sharpless* v. *Mayor etc.,* 21 Pa. St. 164, 59 Am. Dec. 759. In *Adams* v. *Howe,* 14 Mass. 345, 7 Am. Dec. 216, the court say: "We must premise that so much respect is due to any legislative act solemnly passed and admitted into the statute-book that a court of law which may be called upon to decide its validity will presume it to be constitutional until the contrary clearly appears, so that in any case of the kind substantially doubtful the law would have its force. The legislature is in the first instance the judge of its own constitutional powers, and it is only when manifest assumption of authority or misapprehension of it shall appear that the judicial power will refuse to execute it." In Kentucky it has been held that if it be doubtful or questionable whether the legislature has exceeded its limits the judiciary cannot interfere, though it may not be satisfied that the act is constitutional. *City of Louisville* v. *Hyatt,* 2 B. Mon. 178, 36 Am. Dec. 594. To the same effect, among others, are the following cases: *City of Lexington* v. *McGuillan's Heirs,* 9 Dana,

514, 35 Am. Dec. 159; *Cooper* v. *Telfair*, 4 Dall. 14; *Tyler* v. *People*, 8 Mich. 333; *State* v. *Cummings*, 36 Mo. 277.

In view of this well-settled rule recognized in the foregoing cases, apart from the view we take of the organic law,—viz., that the legislature is limited in its sessions to sixty working or legislative days, and not to sixty consecutive days, as contended,—we would hesitate before holding that the legislature had in this instance transcended its powers, and violated the fundamental law of the territory, especially when we consider that this, in effect, would be to annul many of the laws now in force, and thus disturb and unsettle the public credit, destroy private rights, and bring disaster upon the territory. From the foregoing considerations, we hold that, the appropriation bill passed by the fifteenth legislative assembly, and approved April 10, 1889, is a valid law, and that the plaintiff is entitled to his writ. The writ will issue.

Kibbey, J., concurs.

WRIGHT, C. J., dissenting.—The court, in the majority opinion, rightly hold that section 1852 of the United States Revised Statutes, as amended, is mandatory in its terms; but the opinion holds that, when Congress said in said section that the sessions of the said legislative assemblies of the various territories should "be limited to sixty days' duration," it meant sixty legislative working days, and not sixty consecutive days. We are unable to concur in this view; and we now proceed to analyze this section, and endeavor to show that the language employed by Congress necessarily limits sessions of territorial legislative assemblies to sixty consecutive days; and therefore that the fifteenth legislative assembly of this territory, having begun its session on the twenty-first day of January, 1889, was not, and could not have been, without permission of Congress, in legal session on the tenth day of April, 1889. There is no dispute as to the facts. The said fifteenth legislative assembly having begun its regular session at the time fixed by law, viz., on the twenty-first day of January, 1889, sixty consecutive days from that date expired on the twenty-first day of March, 1889; and it is admitted that the act in question was passed on the tenth day of

April, 1889. So that the only and vital question is, was said assembly in legal session on the said tenth day of April, 1889? Clearly, it was not. That assembly was wholly and simply a creature of the national legislature. It was the nursling of Congress, drawing the milk of its existence from Congressional maternity, and living, moving, and having its being in the will of Congress, as expressed in the federal statutes. It therefore had no real legal being outside of those statutes. Necessarily it existed, if at all, according to their provisions. To those statutes, then, to the expressed will of Congress, the creator, must we look for the definition of the rights and powers of the creature. The section of the federal statute containing the principal and expressed limitation upon the duration of the sessions of territorial legislative assemblies is, of course, said section 1852, as amended in 1880. There are other sections of that statute, however, which shed light upon the true meaning of this one. The purpose, the intention, of the law-maker is of the first importance. We shall have obtained a true solution of the main question involved in this case, when we determine correctly, if we may be able to do so, precisely what congress meant by the language it employed in this section. It reads: "The sessions of the legislative assemblies of the several territories of the United States shall be limited to sixty days' duration." Is the latter clause mandatory or directory? The court incidentally say it is mandatory in its terms, but the conclusion arrived at indicates that a discretion is implied. We are unable to perceive how this can be; because, if the meaning of this language is clear and indubitable and is mandatory, it admits of but one true construction, being susceptible of but one true meaning. Yet the court say: "It remains for us to determine which of the two views, as to the proper construction to be placed upon said section, contended for at the hearing of the case, we should adopt, viz.: Upon the one hand, that the session of the legislative assembly is limited therein to sixty consecutive days from the day upon which the assembly convenes; or, upon the other hand, that the session is limited to sixty legislative or working days, exclusive of Sundays, public holidays, and days of intermediate adjournment."

The decision then construes the language to mean sixty

legislative working days, exclusive of Sundays, holidays, and days of intermediate adjournment. It seems to us that, if this construction is correct, it makes the language necessarily directory, and not mandatory; for the reason that sixty legislative working days, exclusive of Sundays, holidays, and days of intermediate adjournment, would necessarily make the session endure longer than sixty consecutive days; and therefore, as the greater includes the less, while the session might endure for seventy or eighty consecutive days, counting Sundays and other days of intermediate adjournment, in order to consume sixty legislative working days the limitation might also be construed to mean sixty consecutive days. In other words, the real point of difference is, plaintiff's counsel contend, that the above language is directory only, and admits of discretion, while the defendant's counsel, and the friend of the court, contend that it is mandatory, and admits of no discretion. For it is here to be observed that the most earnest and strenuous arguments of plaintiff's learned counsel, including the very able argument of Assistant United States Attorney-General Shields, filed herein, were that the said language is directory only. So that it seems to us to be primarily essential to a satisfactory solution of the problem in hand to first determine absolutely, if possible, whether this language is mandatory, or directory only.

Now, at the outset, we say this language is so clearly mandatory that it is really surprising that any one should question its true import. It might be observed that no mandatory phrase or sentence was ever employed that was not also, in a measure at least, directory. When God said, "Let there be light," He both directed and commanded, and the glory and blessing of that subtle agent covered the void earth. If the teacher says to the pupil, "Get your lesson," it is both a direction and command. If the father says to the son, "Go to the stable and bring my horse, by the back gate, into the yard," the language is also a direction and command; but if the son should bring the horse into the yard by the front, instead of the back, gate, we apprehend there would still be a substantial execution of the power or authority conferred. We mean there is quite a difference between the power conferred and the exercise of that power. The grant of power

is generally mandatory, while the phraseology indicating the manner of its exercise is often construed to be only directory, and therefore the irregular exercise of a power would not necessarily render the act performed void. We think most of the cases, where language apparently mandatory has been construed to be directory, will be found upon critical examination to be where there has been an irregular or improper exercise of the power granted, rather than the attempt to exercise a power not conferred. For instance, the election cases referred to by the learned counsel for the plaintiff. In the case at bar the power granted to the legislative assembly by Congress was to hold a biennial session for only sixty days, and the attempt to hold longer than sixty days was attempting to exercise a power not conferred. Mandatory language may be, and is often held to be, directory; directory language seldom is, and rarely is held to be, mandatory. The one is used generally in a permissive sense; the other, in a prohibitive or negative sense. "Thou mayst be saved" is permissive; "Thou shalt not kill" is prohibitive. The one imports discretion, the other does not. Mandatory language is generally that which superiors employ in addressing inferiors. It is generally used where the party using it has the power to control the action of the party to whom it is addressed. Hence the intention of the party using the language should control the construction put upon it, unless the language employed is so absurd or dubious in meaning as to render such intention absolutely uncertain and indefinite. It is the language of the parent to the child, of the teacher to the pupil, of the master to the servant, the principal to the agent. Now, Congress is the principal or master—the superior; the legislative assembly is the agent or servant—the inferior. It is for the principal or master—the superior—not only to direct, but to command; and it is for the agent or servant—the inferior—not only to follow, but to obey. Wherever Congress has intended to give this agent—this inferior—a discretion in action, its language is so clearly directory as not to admit of doubt. This, however, has rarely happened, and but few instances can be found, for now we assert that, with almost unbroken uniformity, wherever Congress, in legislating for the territories, has spoken with reference to the various powers, duties, ses-

sions, etc., of the territorial legislatures, it has used the word "shall" in not simply a directory, but in a mandatory, sense. Let us see: Section 1842 of the Revised Statutes of the United States says: "Every bill which has passed the legislative assembly of any territory shall, before it becomes a law, be presented to the governor," etc. Is this not plainly mandatory? Would any one pretend that, if the legislative assembly were to attempt to pass a law without presenting it to the governor, it would be worth the paper upon which it was written? Again, section 1846 of said statutes in its first sentence says: "The legislative power in each territory shall be vested in the governor and the legislative assembly." Can there be any discretion here? May the legislative power exist elsewhere? Further, we read in the same section: "The legislative assembly shall consist of a council and house of representatives. The members of both branches of the legislative assembly shall have the qualifications of voters as herein prescribed. They shall be chosen for the term of two years, and the sessions of the respective legislative assemblies shall be biennial. Each legislative assembly shall fix by law the day of the commencement of its regular sessions. The members of the council and of the house of representatives shall reside in the district or county for which they are respectively elected." Here we have the use of the word "shall" recurring seven different times in this one section; and all referring directly to the qualifications, powers, duties, sessions, etc., of the members of the territorial legislative assemblies; and is there any possible room for the faintest doubt that, in each instance, the word is used in its absolute, mandatory sense? It is not that the assembly may consist of a council and a house, but it shall so consist; not that the members of both branches may have the qualifications of voters, etc., but they shall have such qualifications; not that they may be chosen for two years, but they shall be; not that the sessions may be biennial, but that they shall be; not that each legislative assembly may fix by law the day of the commencement of its regular sessions, but it shall fix the day; not that the members may reside in their respective districts or counties, but they shall reside therein. Again, the latter part of section 1886 of the Revised Statutes of the United States reads:

"No session of the legislature of a territory shall be held until the appropriation for its expenses has been made." Does this mean that such session may be held, whether the appropriation be made or not? On the other hand, is not the inference irresistible that, unless such appropriation were first made, such session would be void? In other words, is not the appropriation a condition precedent to the legal existence of the session? And still again, section 1888 of said statutes reads: "No legislative assembly of a territory shall, in any instance, or under any pretext, exceed the amount appropriated by Congress for its annual expenses." Here, again, Congress has clearly indicated its purpose to be to limit the sessions of the legislative assemblies to a definite period of sixty days' duration; for appropriations are made upon a basis of sixty days; and we know of no instance where the *per diem* of members, or expenses incurred for longer periods than sixty days, have been paid. This section, then, sheds light upon the meaning of Congress, when it employed the language, "shall be limited to sixty days' duration," and we think it, and other instances referred to, clearly indicates the legislative intent; that Congress said just what it meant, and meant just what it said, when it declared, in plain, unambiguous language, that the sessions of the legislative assemblies of the several territories of the United States shall be limited to sixty days' duration.

If it had been the intention of Congress to rest any discretion; if its purpose had been that the session might be indefinite in duration, but that Congress would only pay for sixty days of it,—would not the language of the statute have been something like this: "The sessions of the territorial legislative assemblies may continue longer, but in no event will the United States pay the expenses thereof for more than sixty days?" And is it not in a measure a reflection upon the wisdom and intelligence of the federal law-makers to impute a doubt to the meaning of the simple, but significant, language they employed? Congress was passing a fundamental law for the guidance of one of the three co-ordinate branches of youthful governments, whose people, being of the frontier in a large measure, were not supposed to be so critical in their civilization and learning as in the older commun-

ities. Is it reasonable to suppose that Congress, in passing this fundamental law, which in its operation was to so seriously affect the people in these frontier governments, would use language of intricate, doubtful, ambiguous, or double meaning? Rather, is it not most reasonable to suppose that Congress intended to use language of the simplest, most certain, and unequivocal meaning? And is this not exactly what Congress has done? Is there any possible room for construction in determining the true meaning of the phrase, "Shall be limited to sixty days' duration?" Is it not, therefore, clear and certain, beyond reasonable doubt, that Congress intended to use the above language, not simply in a directory, but in a mandatory, sense? It will be observed that there are two words in this phrase which are controlling, and which make its meaning absolute,—viz., the words "limited" and "duration.". The word "limited" means narrow, restricted. It is synonymous with the word "circumscribe"; and that word means to inclose within a certain limit; to hem in; to confine; to bound; to limit; to restrict, etc. Mr. Webster defines the word "duration" to mean the power of enduring; continuance in time; "the portion of time during which anything exists." Adding the latter definition of the word "duration" to the phrase, it then would read: "Shall be limited to an existence of sixty days." Is it not evident that the great primal purpose of Congress was to control within fixed, definite limits the sphere of legislative action in these territories? And that when the session began it should continue to exist, to endure, for only sixty days from the day of beginning? Is there any room for construction here? Or, rather, can there be but one true construction? Is the true meaning of this section at all doubtful? Does it not necessarily mean that, whatever the time fixed by the legislative assembly for the session to begin, it could not continue to exist, as a legal organized body, longer than sixty days from said beginning? Sixty days of lawful session; sixty days of legal, organized existence, that is all. It means sixty days, counting one after another, including Sundays, holidays, and any days of temporary adjournment. If Congress had meant to exclude these days from the limit of sixty days' duration, it would have said so. How plain the language; how simple, how certain

the meaning. Although adjournments are had, the sessions go on. This is fundamental. Mr. Blackstone says: "An adjournment is no more than a continuance of the session from one day to another, as the word itself signifies." 1 Blackstone's Commentaries, 186. If Sundays, days of temporary adjournment, etc., were not to be counted as days of the session, then for those days the session would not endure. Is it not plain that, if Sundays, holidays, and all other days of temporary adjournment are not to be counted as parts of the session, the legislature would not be in session during such days, and that it would necessarily have to possess the power to hold any number of distinct sessions? But Congress has only conferred power to hold one session, of sixty days' duration. How, then, can it hold more than one session? Again, to state it a little differently, if Sundays, days of intermediate adjournment, etc., are not included as parts and parcels of the session, the time measured by these days being no part of such session, the session necessarily ceases for that time; but the only and true meaning of the language used by Congress is that, when the session begins, it endures, continues to exist, for sixty days only from said beginning. So that it is simply impossible that there could be but one regular, legal session of the territorial legislative assembly; and it is just as impossible that that session could legally exist, endure, for a period longer than sixty days from its beginning.

Another, and we think a potent, reason why Congress intended by the language used to limit the duration of the session of the legislative assembly to sixty days from its beginning is, that the history of the times, at and recently before the passage of the act, was rife with complaints of extravagance and reckless expenditure in more than one of these legislative assemblies; so that, construing this statute in the light of surrounding circumstances and contemporaneous history, we say that it is evident that the purpose of Congress was to absolutely control, to circumscribe, to hem in, to restrict within fixed definite limits, these legislative assemblies as to the period of their existence; and to fix beyond the line of cavil or discussion the fact that the session could only exist, endure, for sixty days from its beginning. Hence the days of its possible existence were with unerring certainty num-

bered. By the volition of the members of the legislative assembly its session might die before the expiration of the full number of days; but, at all events, it could not live, endure, beyond them. The measure of its existence, the day, the hour, of dissolution, was marked upon the dial-plate in unmistakable phrase. Hence we say again that Congress not only used the language of said section in a directory, but more emphatically in a mandatory sense. To us the language used imports no possible discretion as to the limitation of the period beyond which the session cannot exist. It has but one true meaning. It means the actual hours, days, weeks, etc., elapsing—the one after the other—from the time of the beginning of the session till sixty days, of twenty-four hours each, have passed. For obvious reasons, the time of beginning was immaterial; but, for equally obvious reasons, the time of ending was material. Congress had to pay the bills of expense, which could not be affected by the beginning of these sessions, but would necessarily be seriously affected by their endings,—by the periods of their duration. While, therefore, it is evident that a discretion was intended as to the time of their beginning, it is equally evident that none was intended as to the time of their ending. The limit is fixed, definite, and certain. They may stop this side of the limit. They cannot go beyond it. It is not pretended that the legislative assembly had any inherent power to convene, call itself into legal session, after dissolution; and yet, as we have already seen, if this be not so, how can days of intermediate adjournment be excluded from the session, without the session itself becoming necessarily dissolved? And therefore the assembly would necessarily have to possess inherent power to call itself back into legal session. But the principle is quite a general one that no legislative bodies have this inherent power. When the legislatures of the states end their sessions, they can only reconvene by authority of the governor. When Congress adjourns, the President alone can call one or both branches of it back into legal session. And even the British parliament itself has no inherent power of convention after dissolution; the Queen may prorogue it, and it cannot of itself reconvene. So that, as the supreme court of Dakota says in *Treadway* v. *Schnauber*, "The territorial legislature is a creature of Congress.

Its powers, duties, and sessions are defined and limited by the act organizing the territory, and the amendments thereto, and it derives no life or power from any other source. It is authorized to hold a biennial session of not to exceed forty (now sixty) days, and there is no provision . . . to extend the session beyond the time specified.'' See 1 Dak. 249. The court seem to rely upon the decision of the supreme court of Alabama in *Moog* v. *Randolph.* See 77 Ala. 608. But it must be remembered that the limitation there referred to was upon the sessions of a state legislature, which had given repeated legislative constructions to the limitation contained in the constitution of Alabama, all to the effect that the fifty days' limitation meant fifty legislative working days; and that the court followed that construction—as Mr. Justice Somerville, who delivered the opinion of the court, said—because of the serious consequences that would ensue; the court holding that it would be reluctant to depart from such construction in doubtful cases, the question being no longer *res integra.*

We fully agree with the court, in the case at bar, that, where laws have long been acquiesced in,—where substantial rights have grown up and vested under them,—it is a well-settled policy of the courts not to disturb them, though they may not have been legal or constitutional originally. This was, as we have just seen, the true reason for the decision in the Alabama case; it was also the reason for the Oregon decision. But this doctrine cannot obtain here. The acts of the fifteenth legislative assembly, passed after the expiration of the sixty consecutive days from the beginning of its session, have not been acquiesced in. The validity of those acts has been questioned ever since their passage. The contention over them has superinduced the very litigation at bar. And because it is the policy of the courts not to disturb illegal or doubtful acts, long acquiesced in, for the reason that substantial rights have vested, and evil consequences might ensue, does it follow that the courts ought to uphold illegal or doubtful acts, because substantial rights might vest in the future? We are free to say that in our opinion the various laws, passed by the first and the eleventh legislative assemblies of this territory, after the expiration of sixty consecutive days from their beginning, should not be disturbed simply be-

cause they have been long acquiesced in. But should that
view control the action of the court in the case at bar? If it
should, then the courts could pass upon the validity of no
legislation, because evil consequences might follow *in futuro.*
The court is not called upon to give a construction retroactive
in its effects, but to say whether or not we will truly decide a
living vital issue. Nor will it do to say there has been a uni-
form legislative construction on this subject by our legislative
assemblies. If the first and eleventh legislative assemblies of
this territory construed the limitation to be sixty legislative
working-days, presumably the other thirteen legislative as-
semblies of the territory construed it to mean sixty consecu-
tive days; for we must infer that, if any of the remaining
thirteen legislative assemblies had construed the limitation to
be sixty legislative working days, this resource would have
been drawn upon to strengthen the position taken. At all
events, it is absolutely certain that a number of those assem-
blies did construe the limitation to be sixty consecutive days.
And therefore the territorial legislative construction put upon
the limitation lends neither force to the argument, nor
strength to the position.

For the first time the supreme court of this territory is
called upon to put its construction upon the purview of that
limitation. That construction should be according to the true
tenor and effect of the statute, unaffected by past illegal acts,
acquiesced in, or rights to be hereafter affected under them.
This is plainly so, for all legal questions and rights, arising
under the acts of the fifteenth legislative assembly, passed
after the expiration of the sixty consecutive days, are still
*res integra.* But, even to the modified extent to which the
Alabama case goes, it seems to stand alone. Every other
state legislature, so far as we have been able to learn, whose
sessions have been, or are, limited by their constitutions to a
certain number of days, seems to have entertained no doubt
that the limitation meant consecutive days. The constitution
of Missouri (art. 4, sec. 16) provides that "the members of
the general assembly shall severally receive from the public
treasury such compensation for their services, as may, from
time to time, be provided by law, not to exceed five dollars per
day for the first seventy days of each session, and after that

not to exceed one dollar per day for the remainder of the session," etc.  This constitution was adopted in 1875, and every general assembly of Missouri, that has held a legislative session since, has construed the seventy days' limitation to mean seventy consecutive days from the beginning of the session.  Section 17 of article 5 of the constitution of the state of Arkansas, adopted in 1874, provides that "the regular biennial sessions [of the general assembly] shall not exceed sixty days in duration, unless by a vote of two thirds of the members elected to each house of said general assembly," etc. It will be observed that the words of limitation in this section are very similar in their import to the words of limitation upon the session of the territorial legislative assemblies, contained in section 1852 of the United States Revised Statutes as amended.  The one says, "shall not exceed sixty days in duration," the other says, "shall be limited to sixty days' duration."  Every general assembly of Arkansas that has held a session since the adoption of this constitution, has construed this limitation to mean sixty consecutive days.  And in *Trammell* v. *Bradley*, 37 Ark. 374, the supreme court of that state has passed directly upon the meaning of this limitation; and they use this emphatic language: "The regular biennial session of the legislature had begun on the 10th of January, 1881.  During the session by concurrent resolution, not signed by the governor, the session 'was extended and continued' until twelve o'clock M. on the nineteenth of March, 1881.  The session, if not properly extended, expired on the ninth of March, and the act having been passed after that period, would be invalid."  To say that the words, "shall not exceed sixty days in duration," are mandatory, and mean sixty consecutive days, including Sundays, holidays, and any days of intermediate adjournment, and that the words "shall be limited to sixty days' duration," are not mandatory, and mean sixty legislative, working days, is to make a judicial distinction without a judicial difference.  And it must be further observed that, wherever the courts of last resort in the territories have incidentally passed upon this question, they have indicated their view to be that the limitation was intended to be sixty or other number of consecutive days; i. e. that when the session begins every day must be counted as a

part of the session, till the sixty or other number of days elapse. See *People* v. *Clayton,* 5 Utah, 598, 18 Pac. 628; *Territory* v. *Scott,* 3 Dak. 357, 20 N. W. 401; *Stevenson* v. *Moody,* 2 Idaho, 260, 12 Pac. 902; *Treadway* v. *Schnauber,* 1 Dak. 249, 46 N. W. 464. See, also, *State* v. *Arrington,* 18 Nev. 412, 4 Pac. 735; *National Bank* v. *County of Yankton,* 2 Dak. 365, 101 U. S. 129; and *Bank* v. *State of Iowa,* 12 How. 1.

But if the question were doubtful, if the courts had expressed or intimated views that are conflicting, we should unhesitatingly hold that the opinions of the attorney-general of the United States, delivered on the sixteenth days of March and July last, have put the question beyond the line of discussion. This is the great law officer of the government. In passing upon federal statutes, his opinions, next to the positive judicial determination by the great tribunal of final resort (the supreme court of the United States), are entitled to the highest consideration, and should have the binding force of exalted authority. In an official opinion rendered to the honorable the secretary of the interior, on the sixteenth day of July last, the Honorable W. H. H. Miller, attorney-general of the United States, referring to letters of the governor and secretary of Arizona, bearing dates of June 2d and 26th, respectively, said: "I am unable to find in either any question of law which is not covered by the opinions of this department rendered to you under dates of March 16, May 29, and June 19, 1889. The first of these opinions was to the effect that, under the act of Congress, which is the organic law of the territory, the session of the legislature of Arizona is limited to sixty consecutive days. The corollary to this conclusion seems clear, that any attempted legislation after that time would be nugatory." This language was uttered subsequently to the reception by the attorney-general of the "memorandum" of the assistant attorney-general, Shields, filed with the argument of the learned counsel for the plaintiff herein. This is apparent from the face of each. It must therefore be regarded as a reassertion and indorsement of the views expressed by the attorney-general in his opinion of March 16, 1889, on the same subject; and as already indicated, we regard these opinions by the attorney-general as

Arizona 3—11

decisive of the main question involved in the case at bar. With the attorney-general, we hold that any attempted legislation, after the expiration of the sixty consecutive days, was nugatory. The fifteenth legislative assembly of this territory, having by operation of the law of its being been dissolved after the twenty-first day of March, 1889, on the tenth day of April, 1889, it had ceased to have a legal, organized existence, and could therefore pass no valid acts. Hence it is our conclusion that the prayer of the petition should be denied.